
RECEIVED

MAY 1 3 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

BID FOR POSITION, LLC,

        Bid For Position,

    v.

AOL, LLC, GOOGLE INC., MICROSOFT
CORP., and MIVA, INC.,

        Defendants.

CASE NO. 2:07-cv-582 JBF/TEM

**Jury Trial Demanded**

## DEFENDANTS' JOINT OPENING BRIEF ON CLAIM CONSTRUCTION

*88*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND...................................................................................................1

I.    The Asserted Patent ......................................................................................................1

      A.    Overview...........................................................................................................1

      B.    The Patent Describes a System Where a Bidder's Bids Are Adjusted to Maintain Specific Positions Chosen and Entered into the System by the Bidder, Not Just the Highest Possible Position Available. .......................................2

      C.    The '151 Patent Claims Require That Bidder's Bids Are Adjusted to Maintain Positions of Priority Selected by the Bidder. ....................................................3

      D.    During Prosecution, The Applicant Repeatedly Amended the Claims to Mandate a User's Selection of a Position of Priority in the Auction to Avoid the Prior Art. ...................................................................................................5

II.    The Accused Technology ..............................................................................................6

CLAIM CONSTRUCTION STANDARD .............................................................................7

ARGUMENT...........................................................................................................................8

I.    "Information For Selecting One of the Two or More Positions of Priority That the First Bidder Wishes to Maintain in the Auction" (Claim 1[a]); "Selected One of the Two or More Positions of Priority That the First Bidder Wishes to Maintain in the Auction" (Claim 11[a]) ..............................................................................................8

      A.    The Claim Language Requires The "Information For Selecting" To Be Entered By The Bidder. .....................................................................................9

      B.    The Patent Specification Describes the Bidder's Selection of the Specific Desired Position From The Two More Positions In The Auction. .....................10

      C.    Bid For Position's Amendments During Prosecution Require That There Must be An Actual Selection of The One or Two More Positions in the Auction By The Bidder. ...................................................................................................11

      D.    The Inventor Agrees that the Patent Requires the Bidder Select a Specific Position. .........................................................................................................12

E.     Because the Parties Disagree About the Scope of this Claim Limitation, the Court Must Define Its Scope, and Merely Concluding That This Limitation Has Its "Plain Meaning" Is Insufficient. .............................................13

II.    "Selected Position of Priority" (Claim 1[b, d, e, f], 11[b, d, e], 23, 24) .............................14

A.     The Claim Language and Specification Supports Defendants' Proposed Construction ..............................................................................14

B.     The Prosecution History Further Demonstrates That The "Selected Position of Priority" Is a "Specific Position of Priority Chosen By The Bidder." ..................15

C.     Bid For Position's Proposed Constructions Are Baseless. .....................................16

III.    "Checking For Whether a First Bid From the First Bidder Exceeds a Second Bid From the Second Bidder" (Claim 1[c], 11[c]) .......................................................17

A.     The Plain Meaning of the Claim Language Supports Defendants' Construction. ..............................................................................17

B.     Defendants' Construction Is Supported by the Specification. ...............................18

C.     The Prosecution History Supports Defendants' Construction. ...............................19

D.     Even the Inventor Supports Defendants' Construction. .........................................19

E.     Bid For Position's Proposed Constructions Fail to Address the Disputed Issue. ...19

IV.    "Wherein the Relative Position of Priority for Providing the Service for the First Bidder is Dependent on Whether the Value of the First Bid Exceeds the Value of the Second Bid" (and Analogous Limitation Where "First" and "Second" are Interchanged) (Claim 1[c], 11[b]) .......................................................20

A.     Defendants' Construction is Consistent with the Plain Meaning and Usage in the Claims. ..............................................................................21

B.     Defendants' Construction Is Supported by the Specification. ...............................21

C.     The Prosecution History Supports Defendants' Proposed Construction. ..............22

D.     Even the Inventor Agrees With Defendants' Proposed Construction. ...................23

E.     Bid For Position's Proposed Construction Has No Support in the Specification and Is Based Instead on an Inapplicable Dictionary Definition. ............................23

V.    "The Auction For Determining Continuing Priority [...] For Providing An Ongoing Service" (Claim 1[c], 11[b]) .......................................................24

A.     Defendants' Construction Is Consistent With the Intrinsic Evidence. ..................24

|       | B.    | Inventor Konia Agreed That "Continuing Priority" Means Priority That Continues Over Some Time Period. | 25 |
|       | C.    | Bid For Position Provides No Appropriate Construction. | 25 |
| VI.   |       | "Input Device" (Claim 11[a]) | 26 |
|       | A.    | The Intrinsic and Extrinsic Evidence Shows that "Input Device" Refers to a Bidder Terminal. | 26 |
|       | B.    | Bid For Position's Proposed Construction Is Not Supported By the Specification or the Prosecution History. | 28 |
| VII.  |       | "First" and "Second" (Claim 1[a, b, c, d, e, f], 11[a, b, c, d, e], 12, 13, 23, 24) | 28 |
| VIII. |       | "Maintain" (Claim 1[a, d, e, f], 11[a, b, d, e], 23, 24) | 29 |
|       |       | CONCLUSION | 30 |

# TABLE OF AUTHORITIES

*Liebel-Flarsheim v. Medrad,*
481 F.3d 1371 (Fed. Cir. 2007)................................................................................23

*Markman v. Westview Instruments*
52 F.3d 967 (Fed. Cir. 1995) (en banc),*aff'd,* 517 U.S. 370 (1996) .........................13

*Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340 (Fed. Cir. 2004),
cert. denied, 543 U.S. 821 (2004) ...........................................................................21

*O2 Micro Int'l v. Beyond Innovation Tech. Co.,*
U.S. App. LEXIS 7053 (Fed. Cir. Apr. 3, 2008) .........................................7, 8, 9, 17

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................................7

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*
182 F.3d 1298 (Fed. Cir. 1999)...........................................................................9, 20

*Southwall Techs., Inc. v. Cardinal IG Co.,*
54 F.3d 1570 (Fed. Cir. 1995).............................................................................11, 13

*Vitronics Corp. v. Conceptronic,*
90 F.3d 1576 (Fed. Cir. 1996)......................................................................................7

*Voice Tech. Group, Inc. v. VMC Sys., Inc.,*
164 F.3d 605 (Fed. Cir. 1999) ............................................................................12, 18

*White v. Dunbar,*
119 U.S. 47 (1886) ....................................................................................................15

# NOTE ON CITATIONS

The patent-in-suit, U.S. Patent 7,225,151, is attached to the Declaration of Antonio Sistos as Exhibit 1. References to the patent-in-suit are indicated by column and line number. A reference to "3:15" means Column 3, line 15.

The prosecution history of the patent-in-suit is attached to the Declaration of Antonio Sistos as Exhibit 2. Citations to individual pages are indicated using Bates numbers.

Excerpts from the deposition of the inventor, Brad S. Konia, is attached to the Declaration of Antonio Sistos as Exhibit 3. Citations to the transcript are indicated by page and line number.

The other documents cited herein are attached to the Declaration of Antonio Sistos as Exhibits 4 to 9.

## INTRODUCTION

Defendants AOL, LLC, Google Inc., Microsoft Corp., and Miva, Inc. seek a construction of the disputed claim terms that is consistent with the claim language, consistent with the specification, and consistent with how those terms were defined by the applicant during prosecution of the patent. Indeed, the inventor himself has agreed with many of Defendants' constructions.

By contrast, Plaintiff Bid For Position urges that the Court decline to construe most of the disputed terms – saying that some unstated "ordinary meaning" should control. But for each of these claim terms, there is a dispute regarding the scope of the claim element. Construction of these terms is necessary to resolve the dispute. Referring to some unspecified "ordinary meaning" simply does not define the claim scope with sufficient precision.

## FACTUAL BACKGROUND

### I. THE ASSERTED PATENT

#### A. Overview.

Bid For Position asserts that Defendants Google, AOL, and Microsoft infringe claims 1-4, 11-14, and 23 of U.S. Patent No. 7,225,151, entitled "Online Auction Bid Management System and Method" ("the '151 Patent," Ex. 1). Bid For Position also asserts claims 1 and 11 against Miva. As described in more detail below, the asserted claims of the '151 patent were significantly amended and narrowed over the course of a prosecution spanning seven years, with the claims being rejected eight times and amended five times. Most of the disputed claim terms were added during prosecution to distinguish the claims over the prior art.

**B.** **The Patent Describes a System Where a Bidder's Bids Are Adjusted to Maintain Specific Positions Chosen and Entered into the System by the Bidder, Not Just the Highest Possible Position Available.**

The patent specification describes a system for automatically adjusting bids in an electronic auction.[1] In the auctions that the patent addresses (such as Internet search displays), there was more than one "winner." If different bidders sought to have their web site listed in the paid search results for a given term (say, "Norfolk hardware store"), more than one bidder could have their ads displayed, because many different ads could be listed – in a descending order – when the results of a given Internet search were displayed. (Ex. 1, 3:60-62.) The first ad to appear is said to have the "first position"; the second listing has "second position"; and so forth, in descending order. (*Id.* at 4:55-56.)

The patent specification explicitly states that "[t]he relative priorities for providing the service for bidders for their bids received from the bidder terminals 175 are dependent on *whether their bids exceed the value of other bids.*" (*Id.* at 3:29-32) (*See also id.* at 3:25-32 (The bid management server periodically prioritizes bids based on "whether their bids exceed the value of other bids.")). The claimed invention[2] involves a system for automatically adjusting a given bidder's bid to keep him in whatever position he has chosen in advance (second position, third position, etc.). (*Id.* at 4:55-62.) It is this ability to adjust bids up or down to achieve the bidder's selected position that the applicant relied upon during prosecution to differentiate the invention from the prior art. Indeed, at his deposition, the named inventor, Brad Konia, described his patent as "an innovation in the sense that it allowed people to not necessarily bid to

---

[1] The specification describes four general embodiments in which the claimed bid management system may operate: auctions for search engines (Ex. 1, 3:4 – 5:18), auctions for golf tee-times (*id.* at 5:19 – 7:11), auctions for airline reservations (*id.* at 7:12 – 9:14), and auctions for inventory purchases (*id.* at 9:15 – 13:59). While the specification describes how the system may be used in the various auctions, the description of these embodiments is nearly identical.

[2] Defendants' use of the term "invention" is intended as a convenient reference to the subject matter of the '151 patent. By using this term, Defendants do not concede that the '151 patent describes or claims any subject matter that is new, non-obvious or in any way inventive or patentable.

the highest possible position, *but to bid to a specific position.*" (Ex. 3, 16:16-17:2, emphasis added.)

### C. The '151 Patent Claims Require That Bidder's Bids Are Adjusted to Maintain Positions of Priority Selected by the Bidder.

There are two independent claims to the '151 patent. As discussed further below, the applicant extensively amended the independent claims during prosecution. Claim 1 is presented below with portions removed from the original claim language ~~struck through~~ and amended elements underlined. Defendants have labeled the different limitations with letters and numbers (a, b, c, etc.) that do not appear in the original claim.

1. A method for automatically managing an auction for determining relative priority for a service in a system wherein priority is based on the relative value of related bids, comprising:

(a) (1) <u>receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, (2) the auction having at least two or more positions of priority, (3) the received bid management data including information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction;</u>

(b) <u>checking for if a second bidder holds the selected position of priority, and</u>

(c) checking for whether a first bid <u>from the first bidder</u> exceeds a second bid <u>from the second bidder</u> in the auction for determining continuing priority for providing an ongoing service for the first and second bidder, wherein the relative <u>position of</u> priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and wherein the relative <u>position of</u> priority for providing the service for the second bidder is dependent on whether the value of the second bid exceeds the value of the first bid;

(d) <u>according to the bid management data received from the first bidder, automatically</u> incrementing the first bid to a value exceeding the second bid if the first bid does not exceed the second bid, to thereby ~~causing the relative~~ <u>maintain the selected position of</u> priority for providing the service for the first bidder ~~to exceed the priority for providing service for the second bidder;~~

(e) <u>checking for whether the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction, and</u>

(f) <u>if the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction, automatically reducing the first bid to a minimum which allows the bidder to keep the selected position of priority.</u>

As amended, claim 1 is limited to a method, like that disclosed in the specification, where a user enters "bid management data" containing the bidder's selection of a position in the auction, the system checks to see whether the bidder's bid is larger than another bidder's bid, and the system increases or decreases the bid to maintain the position that was selected by the bidder.

Claim 11, the only other independent claim, is reproduced below. Once again, Defendants have labeled the different limitations with letters and numbers (a, b, c, etc.) that do not appear in the original claim. Defendants have also underlined the claim language that was added during prosecution via amendment, and struck through language that was deleted during prosecution.

11. A system for automatically managing an auction for determining relative priority for a service in a system wherein priority is based on the relative value of related bids, comprising:

(a) (1) <u>an input device for receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, (2) the auction having at least two or more positions of priority, (3) the received bid management data including selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction;</u>

(b) (1) a processor electrically connected to a network (2) <u>for checking for if a second bidder holds the selected position of priority (3) and</u> for checking for whether a first bid <u>from the first bidder</u> exceeds a second bid <u>from a second bidder</u> in the ~~an~~ auction for determining continuing priority on a server electrically connected to the network for providing an ongoing service for ~~a~~ <u>the</u> first and second bidder, wherein the relative <u>position of</u> priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and wherein the relative <u>position of</u> priority for providing the service for the second bidder is dependent on whether the value of the second bid exceeds the value of the first bid, (4) and for <u>automatically</u> incrementing the first bid <u>according to the bid management data received from the first bidder</u> to a value exceeding the second bid if the first bid does not exceed the second bid, <u>to</u> thereby ~~causing the relative~~ <u>maintain the selected position of</u> priority for providing the service for the first bidder ~~to exceed the priority for providing the service for the second bidder~~;

(c) and a database electrically connected to the processor for storing the first and second bids;

(d) <u>the processor further for checking for whether the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction,</u>

(e) <u>the processor further for automatically reducing the first bid to a minimum which allows the bidder to keep the selected position of priority if the first</u>

4

> bid is higher than needed to maintain the selected position of priority that the
> first bidder wishes to maintain in the auction.

Claim 11 is essentially a system version of method claim 1. It includes three additional hardware elements: an input device for accepting bid data entered by the bidder, a database for storing that bid data, and a network processor for performing the checking, incrementing, and decrementing steps described in claim 1.

> **D.     During Prosecution, The Applicant Repeatedly Amended the Claims to Mandate a User's Selection of a Position of Priority in the Auction to Avoid the Prior Art.**

During prosecution of the '151 patent, the applicant repeatedly amended the claims to try to avoid the prior art. The first amendment required that the steps of the claims be performed "automatically."

After that amendment, the Examiner again rejected the claims, and the applicant amended them a second time to require "receiving bid management data" from the bidder and using that data to automatically increase the bids. (Ex. 2, Aug. 4, 2003 Amendment at 4-6, P543-45.) In making this amendment, the applicant stated that "the claimed system only initially requires bid management data so that *the bidder* may provide parameters for the automatic bidding." (*Id.* at 12, P551, emphasis added). The Examiner nonetheless still rejected all the claims.

In response, the applicant amended the independent claims a third time to require

- receiving bid management information that "include[s] a selected position of priority"
- checking for whether a second bidder holds the bidder's "selected position of priority"
- automatically reducing the bidder's bid, if possible, while still maintaining his "selected position of priority." (Ex. 2, Feb. 4, 2004 Amendment at 5, 7, P625, P627.)

In connection with these amendments, the applicant argued that the prior art at issue "fails to disclose a system or method which checks for whether a bidder's bid is too high for a *specific position of priority* or ranking that a bidder wishes to maintain in an auction." (*Id.* at 13-14, P633-34, emphasis added.)

5

Despite these amendments, the Examiner again rejected all the claims. In response to the Examiner's comment that "the prior art does not teach a system or method that checks whether a bidder's bid is too high for a *specific position of priority* or ranking that a bidder wishes to maintain in an auction," the applicant amended the claims a fourth time to require that the bid management data entered by the bidder include the selected position of priority "that the first bidder wishes to maintain in the auction." (Ex. 2, July 21, 2004 Amendment at 4, 6, 9, P681, P683, P686 emphasis added.)

The Examiner once again rejected all claims, specifically noting that a prior art patent taught "selecting a bidding position, specifically the highest ranking bid position (column 6, lines 31-45)." (*See* Ex. 2, Nov. 30, 2004 Non-Final Rejection at 3, P715.) The applicant then amended the claims a fifth time. (*See* Ex. 2, Dec. 9, 2004 Amendment at 3-6, P725-28.) To make clear that simply being able to vie for the highest position in an auction was not enough, the applicant added language to the independent claims to require that the auction have "at least two or more positions of priority" and that the bid management data include "information for selecting one of the two or more positions of priority that the bidder wishes to maintain." (*Id.* at 3, 5, P725, P727.)

Although there were additional rejections made by the Examiner based on newly identified prior art, the applicant "swore behind" these references (claiming an earlier invention date). Ultimately, the claims, as amended in the five amendments, issued in the '151 patent.

## II.  THE ACCUSED TECHNOLOGY

Defendants all sell Internet advertising served in connection with search results by search engines. Advertisers choose terms or "keywords" relevant to their ads. When a user enters a search query in the search engine, if the query matches a keyword chosen by an advertiser (e.g., digital camera), the search engine may display that advertiser's ad (e.g., for a website selling digital cameras) on top of or next to the search results along with other ads. If the user clicks on the ad, the advertiser will be charged for that click.

Each Defendant displays ads according to an auction system. Although each Defendant's auction process is different, there are some common elements. For each Defendant, advertisers can specify the maximum amount they are willing to pay in the event that a user clicks on the advertiser's ad. In the AOL, Google, and Microsoft system, a new auction is conducted each time that an Internet user conducts a search.

Defendants' systems are all fundamentally different from the Bid For Position invention, which requires an advertiser to bid for a specific position where the advertiser wants the ad displayed (i.e., the second, third, or fourth position) and adjusts the bid up or down to keep that position. This disconnect between the patent claims and the Defendants' auction systems is the factual underpinning for many of the positions on claim construction that Bid For Position now advances.

## CLAIM CONSTRUCTION STANDARD

Claim construction is an issue of law. *Markman v. Westview Instruments*, 517 U.S. 370, 384 (1986) (en banc), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit described the governing principles of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). *Phillips* reaffirmed the "bedrock principle" that the starting point in any claim construction analysis is the words of the claims themselves. *Id.* at 1312. Claim terms must generally be given their "ordinary and customary meaning," *i.e.*, the meaning they would have had to a person of ordinary skill in the art at the time of the invention. *Id.* at 1312-13. *Phillips* also emphasized the importance of the specification, noting that "claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). The specification "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

*Phillips* recognized that in addition to the specification, "a court should also consider the patent's prosecution history." *Phillips* at 1317 (quotation omitted). The prosecution history can "inform the meaning of the claim by demonstrating how the inventor understood the invention,"

and aid the court in excluding "any interpretation that was disclaimed during prosecution." *Id.* (citation and quotation omitted).

A "determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning of a term does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2008 U.S. App. LEXIS 7053 at *22 (Fed. Cir. Apr. 3, 2008). In *O2 Micro*, "the parties agreed that 'only if' has a common meaning, but then proceeded to dispute the scope of that claim term, each party providing an argument identifying the alleged circumstances when the requirement must be satisfied." *Id.* at *22-23. The Federal Circuit held that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it," so that it was error to instruct the jury that "only if" had its ordinary meaning without going further to clarify the circumstances when the "only if" requirement was satisfied. *Id.* at *26.

## ARGUMENT

I.    **"Information For Selecting One of the Two or More Positions of Priority That the First Bidder Wishes to Maintain in the Auction" (Claim 1[a]);**

**"Selected One of the Two or More Positions of Priority That the First Bidder Wishes to Maintain in the Auction" (Claim 11[a])**

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| Information entered by the bidder that indicates the bidder's express choice of one of the two or more positions of priority in the auction. | No construction necessary (except to the extent the terms contained in this phrase are separately construed elsewhere). |

A key element in the invention of the '151 patent is the selection by the bidder of a particular position of priority (first, second, third, etc.). The bidder's bid is automatically adjusted, up or down, to try to maintain that position of priority, subject to the maximum bid information provided by the bidder. For the invention to work, the bidder must choose a particular position of priority, and then communicate that choice to the system. During prosecution, the Examiner insisted on claim amendments that imposed those requirements.

8

Claim 11 therefore requires that the "first bidder" (the one making use of the invention) submit "bid management data including selected one of the two or more positions of priority *that the first bidder wishes to maintain in the auction.*" (Ex. 1, 15:11-14, emphasis added.) By the same token, Claim 1 requires that the first bidder provide "information for selecting one of the two or more positions of priority *that the first bidder wishes to maintain in the auction.*" (*Id.* at 14:9-12, emphasis added.)

The dispute here concerns *what* is selected and *who* does the selecting. Defendants maintain that a bidder using the invention must be given *a choice of at least two or more positions of priority*, and that *the bidder* must do the selecting. Bid For Position apparently contends that neither is required by the claim language, and that no construction of this claim term is necessary. A construction is necessary, however, because the parties disagree about the scope of this claim limitation. Consistent with the Federal Circuit's direction in *O2 Micro*, the Court should now resolve that dispute. *See O2 Micro*, 2008 U.S. App. LEXIS 7053 at *26.

A.     **The Claim Language Requires The "Information For Selecting" To Be Entered By The Bidder.**

The proper starting point for claim construction is the claim itself, and the claim language requires that the bidder select the position he wishes to maintain. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999). Claim 1 specifies that the first bidder submit "bid management data including information for selecting one of the two or more positions of priority." (Ex. 1, 14:9-11.) Claim 1 also recites that this information is received "from a first bidder." (Ex. 1, 14:6) Claim 11 likewise requires that the first bidder provide "bid management data including selected one of the two or more positions of priority," and states that this data is received "from a first bidder." (*Id.* at 15:8-13.) Thus, the claim language itself requires that the selection between the "two or more positions of priority" be made by the bidder.

9

**B.    The Patent Specification Describes the Bidder's Selection of the Specific Desired Position From The Two More Positions In The Auction.**

In the "Detailed Description of the Preferred Embodiments" section of the specification, the inventor first provides a generic description of the invention. The specification notes that "[t]he online bid management system 102 will increment the lower bids until they reach *desired bidding positions entered by the bidders* as long as the bids do not exceed maximum values entered by the respective bidders." (Ex. 1, 3:40-44, emphasis added.) Because the "desired bidding positions" are "entered by the bidders" (*id.* at 3:42-43), they are necessarily selected by the bidders.

The specification then gives several examples of the invention; in each example, the selection of a position of priority (first, second, third, etc.) is made expressly by the bidder. For example, in the Internet search example, the specification explains:

> Another example *allows the bidder to choose a position, such as fourth in the results listing.* If the system finds that the bidder has achieved the proper position in the search engine with respect to the current term being processed, the system may reduce the bid to a minimum which allows the bidder to keep the position, step 210. Otherwise, the system increases the bid without exceeding the maximum bid entered by the bidder, step 212. (Ex. 1, 4:55-62, emphasis added.)

There is no ambiguity about who chooses the "selected position of priority" in this example: the system "allows the bidder to choose." (*Id.* at 4:55-56.)

Likewise, in the golf tee-time example, the specification explains that an auction could be conducted where the highest bidder received the 9:00 am tee-time, and other bidders were assigned positions of priority based upon the proximity to 9:00 am. (*Id.* at 6:4-14.) A bidder could "choose a tee-time, such as 9:30 am instead of the premium time of 9:00 am." (*Id.* at 6:51-52.) Having chosen a position of priority (9:30 am, 10:30 am, etc.), the system increases and decreases the bidder's bid to achieve the bidder's selected position:

> The online bid management system 102 increments the lower bids until they reach *desired bidding positions entered by the bidders* as long as the bids do not exceed maximum values entered by the respective bidders. (*Id.* at 5:58-61, emphasis added.)

Of course, in order for the "desired bidding positions" to be "entered by the bidders" (*Id.* at 5:59-60), the bidders must choose the bidding positions they desire.

In the third example, involving airline seats, the specification again makes clear that the bidder chooses his desired priority:

> *Another example allows the bidder to choose a desired seat, such as a first-class front row, and the system can determine the cheapest position that can be taken for the frequent flyer to be given that seat selection relative to the other frequent flyers.* If the system finds that the frequent flyer has achieved the desired seating priority with respect to the current frequent flyer reservation server 154 processed, the system may reduce the bid to a minimum which allows the frequent flyer to keep the desired seating priority, step 710. Otherwise, the system increases the bid without exceeding the maximum bid entered by the frequent flyer, step 712. (*Id.* at 8:51-61, emphasis added.)

The selection of which "desired seat" to seek is made by the bidder: the invention "allows the bidder to choose a desired seat." (*Id.* at 8:51.)

### C. Bid For Position's Amendments During Prosecution Require That There Must be An Actual Selection of The One or Two More Positions in the Auction By The Bidder.

The originally-filed claims did not require "information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction." The applicant added this limitation to distinguish his invention from the prior art. The final claim language was the result of several different amendments. First, the applicant amended the claims to require that "the received bid management information includ[ed] a selected position of priority." (Ex. 2, February 4, 2004 Amendment at 4, P624.) After the Examiner again rejected the claims, the applicant further specified that the selected position of priority be one "that the bidder wishes to maintain in the auction." (Ex. 2, July 21, 2004 Amendment at 4, P681.)

When this amendment was made, the applicant argued that "the Examiner stated that the art does not teach a system or method that checks whether a bidder's bid was too high for *a specific position of priority or ranking that a bidder wishes to maintain in an auction.*" (*Id.* at 9, P686, emphasis added.) According to the applicant, the amendment made clear that the claimed invention had this feature. Of course, for a system to maintain a "specific position of priority"

that a bidder wishes to maintain, the bid management information provided by the bidder must include the bidder's choice of a specific position (second, third, etc.).

After the Examiner again rejected the claims over prior art, the applicant amended the claims to the present form, requiring that "the received bid management ~~information~~ data includ[e] ~~a~~ information for ~~selected~~ selecting one of the ~~position~~ two or more positions of priority." (Ex. 2, December 9, 2004 Amendment at 3, P725.) This amendment clarified that the bidder was, in fact, doing the selecting. It also clarified that what was being selected was "one of the two or more positions of priority." The Court should give this prosecution history substantial weight, because "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). *See Nystrom v. Trex Co.*, 2002 U.S. Dist. LEXIS 27501, at *14 (E.D. Va. July 1, 2002) (patentee's amendments during prosecution to avoid prior art "serve to further limit the scope of the term").

### D.    The Inventor Agrees that the Patent Requires the Bidder Select a Specific Position.

Inventor Konia's understanding of what the patent requires is consistent with Defendant's position. Konia testified that the alleged "innovation" of the patent was that "it allowed people to not necessarily bid to the highest possible position, *but to bid to a specific position*." (Ex. 3, 16:16-17:2, emphasis added.) He further testified:

> Q: Okay. How does the system of the '151 patent know what -- what specific position of priority or ranking *the bidder wishes to maintain in an auction*?
>
> A: *It's specified by the bidder.*

(*Id.* at 239:23-25, emphasis added. *See also id.* at 12:20-24 ("This is a patent that -- that covers the process of automating an online auction involving two or more positions of priority, *allowing the bidder to specify a desired position* and automatically maintaining that position at the lowest possible price for the bidder") (emphasis added), 15:24-17:2, 119:4-18, 257:14-25, 261:3-9). Konia's testimony is relevant to claim construction. *See Voice Tech. Group, Inc. v. VMC Sys.*,

*Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) (an inventor is "a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims").

### E. Because the Parties Disagree About the Scope of this Claim Limitation, the Court Must Define Its Scope, and Merely Concluding That This Limitation Has Its "Plain Meaning" Is Insufficient.

Bid For Position provides no construction of this claim element at all, supposedly deferring to "plain meaning." But the parties disagree about the scope of this claim limitation. In Defendants' view, the limitation is only satisfied where a bidder enters information that indicates the bidder's express choice of one of two or more positions of priority. In Bid For Position's infringement contentions, by contrast, Bid for Position asserted that this claim limitation would be met where a bidder sought "to maintain the highest position that it can afford, consistent with its maximum" bid. (*See* Ex. 7 at 17; *see also* Ex. 8 at 9, Ex. 9 at 10). Bid For Position apparently seeks a "plain meaning" construction so that it can argue at trial that a bidder that seeks "the highest position it can afford, consistent with its maximum" bid, has made a choice of "one of the two or more positions of priority."

However, virtually any auction enables bidders to do the best they can, consistent with their maximum bid. What is described in the specification and the claims of the '151 patent is quite different. There, bidders are given not merely the ability to vie for the highest priority they can afford in the auction – in addition, they are given the ability to make an express choice among two or more positions of priority. Getting only the highest position the bidder can afford, rather than actually selecting one of the two or more positions available, is precisely the subject matter that was surrendered when the applicant added the disputed claim language.

The claim language at issue here requires that the bidder select a position from at least two available positions; Bid for Position's proposed construction "would render the disputed claim language mere surplusage." *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.3d 1165, 1171 (Fed. Cir. 1993). Such a construction would also depart radically from what the

inventor came up with and disclosed in his specification; as discussed above, he testified that the alleged "innovation" of the patent is allowing the user to select his choice of position, *not* just the highest position possible. (Ex. 3, 16:16-17:2).

## II. "Selected Position of Priority" (Claim 1[b, d, e, f], 11[b, d, e], 23, 24)

| Defendants' Construction | Bid For Position's Construction |
| --- | --- |
| The specific position expressly chosen by the bidder. | Alternative 1: no construction necessary<br>Alternative 2: "the position of priority selected from the bid management data received from the first bidder."<br>Alternative 3: "selected" means "chosen based on fitness or preference." No construction is necessary for "position of priority." |

The next claim term, "selected position of priority," involves a similar dispute: who picks the position of priority? In Defendants' view, it must be the bidder. Each of Bid for Position's three alternative constructions suggests it need not be, and indeed Bid for Position's inability to settle on any one construction reflects the lack of merit in each.

### A. The Claim Language and Specification Supports Defendants' Proposed Construction

The term "selected position of priority" appears in five locations in each of claims 1 and 11. Claim 1 is set forth below with the instances of the disputed term shown in bold:

1. A method for automatically managing an auction for determining relative priority for a service in a system wherein priority is based on the relative value of related bids, comprising:

receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, the auction having at least two or more positions of priority, the received bid management data including information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction;

checking for if a second bidder holds the **selected position of priority,** and checking for whether a first bid from the first bidder exceeds a second bid from the second bidder in the auction for determining continuing priority for providing an ongoing service for the first and second bidder, wherein the relative position of priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and wherein the relative position of priority for providing the service for the second bidder is dependent on whether the value of the second bid exceeds the value of the first bid;

according to the bid management data received from the first bidder, automatically incrementing the first bid to a value exceeding the second bid if the

14

first bid does not exceed the second bid, to thereby maintain the **selected position of priority** for providing the service for the first bidder;

checking for whether the first bid is higher than needed to maintain the **selected position of priority** that the first bidder wishes to maintain in the auction, and if the first bid is higher than needed to maintain the **selected position of priority** that the first bidder wishes to maintain in the auction, automatically reducing the first bid to a minimum which allows the bidder to keep the **selected position of priority**.

(emphasis added).

From the claim language itself, it is apparent that the bidder is the one that chooses the "selected position of priority." After all, the "bid management data" is received "from a first bidder," and this "bid management data" includes "information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction." The later references in the claim to "selected position of priority" all build on this foundation. Further, as explained above, the specification confirms that "selected position of priority" means the specific position expressly chosen by the bidder. (*See* Ex. 1 at 3:40-44, 4:55-60, 6:50-53, 8:51-55).

**B.    The Prosecution History Further Demonstrates That The "Selected Position of Priority" Is a "Specific Position of Priority Chosen By The Bidder."**

The original claims did not include the phrase "selected position of priority." This phrase was first added in a February 4, 2004 amendment. In the "remarks" that accompanied the amendment, the applicant directed the Examiner to the application, page 6, lines 15-19, as allegedly providing support for this new limitation. (Ex. 2, at 13, P633.) This passage of the application provides that the bidder may "choose a position, such as fourth in the search listing," which is an example of the bidder expressly choosing a specific position in the auction.

In addition to relying on this passage for alleged support, the applicant argued that the prior art "fails to disclose a system or method which checks for whether a bidder's bid is too high for a *specific position* of priority or ranking that a bidder wishes to maintain in the auction." (*Id.* at 9, 13, P629, P633 emphasis added.) The added language – "selected position of priority" – made clear that the claimed invention had an element (checking for a "specific position" of priority that the bidder wishes to maintain in the auction) that was missing from the prior art.

15

This "specific position" language is important, and Defendants' proposed construction incorporates it. These were the words that the applicant himself used to define what he meant by "selected position of priority," and the Court should interpret the claim language in accordance with what the applicant said during prosecution. *See White v. Dunbar*, 119 U.S. 47, 51-52 (1886) (patent claim is not a "nose of wax" to be twisted one way to preserve a patent's validity and another way to catch an alleged infringer); *Southwall Techs.*, 54 F.3d at 1576 (claims "may not be construed one way in order to obtain their allowance and in a different way against accused infringers").

### C.   **Bid For Position's Proposed Constructions Are Baseless.**

As its principal argument, Bid For Position contends no construction is needed for "selected position of priority." This is wrong, however, because a construction *is* needed to resolve the question of who chooses the selected position of priority. This is an important issue in the case because Bid For Position has asserted, in its infringement contentions, that if the entity running the auction (not the bidder) chooses a "selected position of priority," then the claim requirements would still be literally satisfied. (*See* Ex. 7 at 20-21, Ex. 8 at 11, Ex. 9 at 12). But the claim language, the specification, and the prosecution history leave no doubt on this score – the "selected position of priority" is chosen by the bidder, not the auction system. Even inventor Konia agrees that the selection of the position is done by the bidder. (*See* Ex. 3 at 12:15-24, 15:24-17:2; 119:4-18; 257:14-25; 261:6-9.) The Court should construe the claim language accordingly.

Bid For Position also provides two "alternative" constructions. In its "Alternative 2" to its principal position (plain meaning governs), Bid For Position says that "selected position of priority" should be construed to mean "the position of priority selected from the bid management data received from the first bidder." However, Bid For Position's "Alternative 2" construction is silent on who does the selection. Its construction permits the selection to be performed by the auction management system, the auction operator, or someone else.

As its "Alternative 3," Bid For Position says that "selected" should be construed to mean "chosen based on fitness or preference." But this too ignores the central issue of *who* does the selecting. Again, Bid For Position's construction would permit the selection to be performed by someone other than the bidder, contrary to the patent specification and the prosecution history. Further, the specification never describes a "selection" of a position of priority based on "fitness." What does it mean to say that the second position for a given bidder would be more "fit" than the third position? Who would make that determination, if not the bidder? How? The specification never says.

III.    **"Checking For Whether a First Bid From the First Bidder Exceeds a Second Bid From the Second Bidder" (Claim 1[c], 11[c])**

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| Determining whether the bid entered by the first bidder is larger than the bid entered by the second bidder. | Alternative 1: "checking" means "verifying, comparing, inspecting, or ascertaining;" the rest of the phrase requires no construction.<br>Alternative 2: "checking" means "verifying, comparing, inspecting, or ascertaining"; "exceeds" means "greater than"; and the rest of the phrase requires no construction. |

The next disputed claim term is "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder." The issue here is whether there must be an actual determination whether the first bid is larger than the second bid. Defendants say that such a determination is absolutely required. Bid For Position's apparent position is that it is sufficient to "check" the first bid and "check" the second bid, without making any determination of whether the first is larger than the second. Consistent with *O2 Micro*, the Court should now resolve this dispute.

A.    **The Plain Meaning of the Claim Language Supports Defendants' Construction.**

The claim limitation itself requires that the first and second bids must not only be "checked," but that the two bids must also be compared "for whether a first bid from the first bidder exceeds a second bid from the second bidder." The comparison of bid amount is an

absolute requirement of the claim language itself. This comparison of bid amounts is done for a reason. Later in claim 1, for example, the claim contains this language: "automatically incrementing the first bid to a value exceeding the second bid if the first bid does not exceed the second bid." The comparison of bid amounts is performed in order to facilitate the automatic incrementing that follows (in the event that the first bid amount does not exceed the second bid amount).

## B.    Defendants' Construction Is Supported by the Specification.

The specification supports Defendant's construction as well. It states that "[t]he relative priorities for providing the service for bidders for their bids received from the bidder terminals 175 are dependent on whether their bids exceed the value of other bids." (Ex. 1, 3:29-32). To determine priority to the service,

> [t]he system checks for whether the bidder's desired position is met for the particular web page and term, step 208. For example, the system *checks* for whether the bidder's bid *exceeds all other bids* in the auction for determining continuing priority for listing the bidder's web page." (*Id.* at 4:50-55, emphasis added.)

If the system finds another bid that is larger than the first bidder's bid, the system "increases the bid without exceeding the maximum bid entered by the bidder." (*Id.* at 4:61-62.) The determination of which bid amount is larger must be made in the checking step.

Defendants' construction also makes clear that the reference in the claim language to a "bid from the first bidder" means a bid *entered* by the first bidder. This is what the specification describes. It states, for example, that "[a] user may *enter a bid* into the online bid management system 102 through the bidder terminal," showing that the bid originates from the bidder terminal. (*Id.* at 3:22-23, emphasis added.) The specification further notes that "the relative priorities for providing the service for bidders for their *bids received from the bidder terminals* 175 are dependent on whether their bids exceeds the value of other bids." (Ex. 1, 3:29-32, emphasis added.) "Bidders may also enter minimum and maximum bids into their bidder terminals." (*See, e.g., id.* at 3:36-38.) Of course, were the bid not entered by the bidder, it would not be from the bidder. Defendants' construction of "from the bidder" as meaning "entered by

18

the bidder" is thus supported by both the plain meaning of "from" and by the description of the auction in the specification.

## C.   The Prosecution History Supports Defendants' Construction.

Defendants' construction is further supported by the prosecution history. The applicant added "from the bidder" to the claims in the August 4, 2003 Amendment, citing to what is now at 3:36-52, as well as Fig. 1, Item 175; Fig 4, Item 177; Fig. 6, Item 179; and Fig. 8, Item 181. (*See* Ex. 2, August 4, 2003 Amendment at 13, P552.) These portions of the patent specification, as explained above, describe bidders entering bids into bidder terminals. The patent figures all refer to bidder terminals in the network diagram for the various embodiments of the '151 patent. Thus, the applicant specifically cited to the portions of the patent relating to bidder terminals to support the "from the bidder" claim language, unequivocally linking that language to bids entered by the bidder at the bidder terminal.

## D.   Even the Inventor Supports Defendants' Construction.

During his deposition, inventor Konia was confronted with this claim language and asked what it means. (Ex. 3, 263:18-23.) He responded: "it's taking two – two bids for a – two bidders for a particular key phrase and checking to see if one has a higher bid than the other." (*Id.* at 264:3-5.) In other words, the inventor agrees with the Defendants on the meaning of this claim term, and the Court is entitled to take this testimony into account when construing the claims. *See Voice Tech. Group,* 164 F.3d at 615.

## E.   Bid For Position's Proposed Constructions Fail to Address the Disputed Issue.

Bid For Position suggests that the Court address this limitation by defining the claim term "checking" and perhaps the claim term "exceeds." However, defining those terms does not resolve the central issue: whether the phrase requires a determination of whether the bid entered by the first bidder is larger than the bid entered by the second bidder. The parties disagree about this aspect of the claim scope, and this disagreement is apparent from Bid For Position's

19

infringement contentions. They mention "checking" the first bid and "checking" the second bid, but ignore any notion that this limitation requires the bids to be compared to one another. (*See, e.g.*, Ex. 7 at 23-24, Ex. 8 at 13). Bid For Position's contention is apparently that the system need only ascertain the first bid and the second bid, but that no determination need be made whether one bid is larger than the other. But this is contrary to the plain meaning of the language and the claims. Again, the claimed system does not merely (and uselessly) examine bid amounts entered by bidders; it compares the two bid amounts to determine which is higher.

IV. **"Wherein the Relative Position of Priority for Providing the Service for the First Bidder is Dependent on Whether the Value of the First Bid Exceeds the Value of the Second Bid" (and Analogous Limitation Where "First" and "Second" are Interchanged) (Claim 1[c], 11[b])**

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| where the bidder that bids the higher amount always gets priority over the bidder that bids the lower amount | Alternative 1: No construction necessary (except to the extent the terms contained in this phrase are separately construed elsewhere). Alternative 2: "value" means "relative worth, utility, or importance." |

Claim 1 and claim 11 contain this identical language which describes the required rules for determining which bidder will be awarded which position of priority:

> wherein the relative position of priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and where the relative position of priority for providing the service for the second bidder is dependent on whether the value of the second bid exceeds the value of the first bid.

Defendants' construction takes this extended phrase and simplifies it according to its plain meaning. Bid For Position, however, only offers a construction of "value."

The fundamental dispute here is whether the "value" of the bid is the bid amount, as Defendants assert, or whether the concept of value can have some other unspecified qualitative component (so that for example, a $2 bid can have a greater "value" than a $5 bid). The Court should adopt Defendants' proposed construction because it honors the plain meaning of the claim language, is consistent with the specification, and fits with the other claim language.

### A. Defendants' Construction is Consistent with the Plain Meaning and Usage in the Claims.

Again, the "starting point for any claim construction must be the claims themselves." *Pitney Bowes,* 182 F.3d at 1305. Defendants' proposed construction adheres to the plain meaning of the claim language: a bid with a higher bid amount has a greater "value" than a bid with a lower bid amount, pure and simple.

Defendants' proposed construction is also consistent with other claim language. After reciting the limitation at issue here, Claim 1 goes on to state:

> according to the bid management data received from the first bidder, automatically *incrementing the first bid* to a value exceeding the second bid *if the first bid does not exceed the second bid,* to thereby maintain the selected position of priority for providing the service for the first bidder.

(Ex. 1, 14:26-31, emphasis added.) This other claim language makes clear that the "incrementing" step is only triggered "if the first bid does not exceed the second bid." This trigger turns on a comparison of the first bid amount with the second bid amount. If "the first bid does not exceed the second bid," then the first bidder's bid is automatically "incremented," or increased, to "a value exceeding the second bid." In other words, the first bidder's bid is raised until the bid amount is larger than the bid amount of the second bidder. The very language of this limitation equates "value" with bid amount, and leaves open no other interpretation.

### B. Defendants' Construction Is Supported by the Specification.

Defendants' proposed construction is also supported by the specification. In the "Summary of the Invention," the patentee broadly characterizes the invention as involving a "method and system for automatically managing an auction for determining relative priority for a service in a system wherein priority is based on the relative value of related bids." (Ex. 1, 1:33-36.) In the very next sentence, the patentee explains, quite specifically, that "[t]he method comprises *checking for whether a first bid exceeds a second bid* in an auction for determining continuing priority for providing an ongoing service." (*Id.* at 1:36-39, emphasis added.) A first bid exceeds a second bid when the first bid amount is higher than the second bid amount.

Because these statements appear in the "Summary of the Invention" section of the patent, the reader can properly conclude that they "are not limited to describing a preferred embodiment, but more broadly describe the overall inventions." *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004), cert. denied, 543 U.S. 821 (2004).

The remainder of the specification is in accord. For example, the specification goes on to state that "[t]he relative priorities for providing the service for bidders for their bids received from the bidder terminals 175 are dependent on *whether their bids exceed the value of other bids*," thus directly equating bids with values of bids. (Ex. 1 at 3:29-32.) The specification similarly explains that "[t]he online bid management system 102 will increment the lower bids until they reach desired bidding positions entered by the bidders as long as the bids do not exceed maximum values entered by the respective bidders." (*Id.* at 3:40-44.) Again, this portion of the specification treats bids and values of bids as synonyms.

None of the examples described in the specification awards priority to a bidder whose bid amount is less than a second bidder's bid amount. To the contrary, in each example, the bidder with the higher bid amount wins priority over another bidder with a lower bid amount. Indeed, in the very first example (which involves priority for search results listings in an Internet search), the specification explains that "the web pages of bidders that bid higher than other bidders having web pages bidding for the same term are ranked higher on the search results." (Ex. 1, 3:62-64.)

## C. The Prosecution History Supports Defendants' Proposed Construction.

During prosecution, the applicant also treated "bid" and "bid value" as interchangeable. At one point, the applicant described "incrementing the first bid *to a value not exceeding the second bid* if *the first bid does not exceed the second bid*, thereby causing the relative priority for providing service for the first bidder to exceed the priority for providing service for the second bidder." (Ex. 2, December 12, 2002 Amendment at 10, P476, emphasis added.)

**D.** **Even the Inventor Agrees With Defendants' Proposed Construction.**

When asked the meaning of this claim limitation (Ex. 3, 264:10-17), inventor Konia gave this testimony:

> A.    It's -- it's -- I suppose it's providing the context for what we're discussing. We're discussing an auction in which the position of priority is determined by who has the higher bid.
>
> Q.    And what you're looking for there is whether they have -- what their -- their bid amount is higher, is that --
>
> A.    Yes, whether the bid amount is higher.

(*Id.* at 264:18-25).

**E.** **Bid For Position's Proposed Construction Has No Support in the Specification and Is Based Instead on an Inapplicable Dictionary Definition.**

Bid For Position's proposal that "value" refers to some subjective notion of "relative worth" or "importance" has no support in the patent. The specification does not describe any valuation function for comparing bids, other than the cash amount. Nor does it describe how the system can increase or decrease a bid to maintain a selected position of priority, other than by raising or lowering the bid amount. The absence of such a description is no accident: as he indicated during his deposition, the inventor did not think that his invention involved any comparison of bids that looked at anything other than the respective bid amounts. (Ex. 3, 264:10-25)

Bid For Position's definition of value would mean that the claims cover subject matter that is not discernable from the specification. Put another way, the specification does not show that the inventor had possession of what Bid for Position now says is the full scope of the claimed subject matter. Accordingly, if the Court were to adopt Bid for Position's proposed construction, the claims would be invalid for failure to satisfy the "written description" requirement in 35 U.S.C. § 112. *See Liebel-Flarsheim v. Medrad*, 481 F.3d 1371, 1378-80 (Fed. Cir. 2007).

23

V.    "The Auction For Determining Continuing Priority [...] For Providing An Ongoing
      Service" (Claim 1[c], 11[b])

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| The auction that determines priority for each instance that a service is provided during a continuing period | No construction necessary; or "continuing priority" means "ongoing priority;" "Ongoing service" means "a service that is ongoing, continuing or in progress." |

Claim 1 describes the auction environment that employs the invention as "the auction for

determining continuing priority for providing an ongoing service." Claim 11 contains similar

language: "the auction for determining continuing priority on a server electrically connected to

the network for providing an ongoing service." Notably, this claim language requires an auction

that not merely determines "priority," but also establishes "continuing priority." The dispute

here is over the significance of the word "continuing." Defendants maintain that it means that

the auction determines priority for each instance that a service is provided during a continuing

period. Bid For Position denies that there is any such requirement. Bid For Position proposes a

circular construction for portions of the phrase, swapping the word "continuing" for "ongoing"

and vice versa.

A.    **Defendants' Construction Is Consistent With the Intrinsic Evidence.**

The specification uses the term "priority" to refer to the ordering of the bidders or the

preference bidders receive for their selected position within the auction. For example, it states,

"[t]he system comprises a server 100 comprising an online bid management system 102 for

automatically managing an auction for determining relative priority for a service in a system

wherein priority is based on the relative value of related bids." (Ex. 1, 3:6-10; *see also id.* at

4:21-24 ("The method is for automatically managing the auction for determining relative priority

for a service in a system wherein priority is based on the relative value of related bids.")).

This claim limitation requires more than an auction for "priority." It requires an auction

for "continuing priority." The "continuing priority" that is contemplated is priority continuing

over time. The specification discussed this sort of priority when it described the "continuing

priority" that winning bidders obtained by using a prior art auction management system operated by Goto.com. (Ex. 1, 1:10-22) As explained in a prior art Goto.com patent, "[t]he web site promoter" in the Goto.com system "influences the rank position for the search listing through an ongoing online competitive bidding process with other web site promoters." (Ex. 4, U.S. Patent 6,269,361, 5:59 – 6:8). Each "winner" of the Goto.com auction would receive lasting ranking (first, second, third, etc.) for all related web searches until another advertiser entered a new bid for the same keyword. (*Id.*). At that point, the auction would run again. (*Id.*). The GoTo auction would provide the bidders with priority to each search engine placement for a continuing period of time – i.e. until the next bid. Thus, Goto.com was an "auction for determining continuing priority for providing an ongoing service," as the phrase is used in Claim 1.

**B.      Inventor Konia Agreed That "Continuing Priority" Means Priority That Continues Over Some Time Period.**

During his deposition, inventor Konia agreed that "continuing priority" means priority continues over some time period:

Q. But until someone outbid you, you had the continuing priority?

A  You had the continuing -- priority 1, yeah.

Q  Well, was that priority continuing over that time period?

A. It's continuing for as long as -- for as long as you have that particular priority, yeah.

(Ex. 3, 244:17-23; *see also* 13:7-15:12, 104:23-105:3, 243:23-244:6, and 247:4-23).

**C.      Bid For Position Provides No Appropriate Construction.**

Bid For Position's proposed construction is insufficient because it fails to resolve the dispute between the parties over the scope of this claim limitation. Instead, it merely provides circular definitions for two phrases in the disputed limitation: "continuing priority" is defined to mean "ongoing priority," and "ongoing service" is defined to mean "a service that is ongoing, continuing or in progress." In other words, Bid For Position defines "continuing priority" as "ongoing priority" and "ongoing service" as a "continuing service." Apart from being circular,

Bid For Position's proposed construction leaves unresolved the central dispute over claim scope: is "continuing priority" different from "priority," and if so, how?

The issue has practical significance in the litigation because the accused keyword auctions of Google, AOL, and Microsoft do not provide any "continuing priority." Instead, there is a separate auction each time a keyword is entered by a new end user. Winning one auction gives an advertiser priority for that one search, and that search only – the "priority" is not "continuing" in any sense.

## VI. "Input Device" (Claim 11[a])

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| Bidder terminal or other data entry device at the bidder's location | "input device" means "a device for transferring data into a processor system." |

Claim 11 requires the use of an "input device" in connection with the "bid management data" that the "first bidder" provides. The principal dispute is whether the "input device" must be a data entry device at the bidder's location. Bid For Position proposes a definition of "input device" that is so broad that it would encompass virtually anything that transfers data (such as Defendants' servers do in receiving data from their customers).

### A. The Intrinsic and Extrinsic Evidence Shows that "Input Device" Refers to a Bidder Terminal.

The reference to "input device" in Claim 11 was added during prosecution by an August 4, 2003 amendment. (Ex. 2, August 4, 2003 Amendment at 5, P544). In order to persuade the Examiner that this new claim limitation was supported by the specification, the applicant specified where the claimed "input device" was discussed in the specification. Significantly, all of the references were to data entry devices at the bidder location.

Specifically, the applicant cited the specification at what is now 3:36-52: "Bidders may further enter maximum and/or minimum bids into *the bidder terminals 175.* The online bid management system 102 keeps track of the maximum and minimum bids for each user who enters bids into the bidder terminals 175 into RDBMS 104." (Ex. 1, 3:36-40). These "bidder

terminals," obviously, were data entry devices at the bidder location. The applicant also cited
Figure 1, item 175, which is clearly labeled in the figure. The label (reproduced below in the
upper right of the figure) reads "Bidder Terminals."



The other cited figures (Fig. 4, item 177; Fig. 6, item 179; and Fig. 8, item 181) show similar
network architectures for the other disclosed embodiments.

Defendants' definition is also consistent with the common usage of the term "input
device" in the art. For instance, the *Microsoft Computer Dictionary* defines input device as a
"peripheral device whose purpose is to allow the user to provide input to a computer system.
Examples of input devices are keyboards, mice, joysticks, and styluses." (Ex. 6; *see, e.g.*, Ex. 1,
3:11-13, 3:36-38).

Finally, Defendants' proposal is also consistent with inventor Konia's understanding of
what "input device" meant in his patent claims. When asked about this claim term during his
deposition, he agreed that "input device" meant a "keyboard" or some other device that was used
by the bidder to communicate his rules for bidding. (Ex. 3, 252:13-253:1).

**B.** **Bid For Position's Proposed Construction Is Not Supported By the Specification or the Prosecution History.**

Under Bid For Position's proposed construction ("input device" means "a device for transferring data into a processor system"), an "input device" could potentially be the bidder terminal, a Web server, or any of the millions of switches, routers, cables, and other devices that may pass data from the bidder terminal through the Internet, or even the Internet itself. There is no support for such a broad construction in the intrinsic evidence. When the claim limitation was added, the applicant told the Examiner where in the specification there was support for the claim term. His references were all limited to data entry devices at the bidder's location.

The dispute over this claim term, again, has practical significance in the litigation. In order to literally infringe the claims under Defendants' constructions, it would be necessary for a bidder to use an input device supplied by the Defendants to input the specific position that the bidder expressly chose. Defendants do not provide their customers with such terminals.

VII.  **"First" and "Second" (Claim 1[a, b, c, d, e, f], 11[a, b, c, d, e], 12, 13, 23, 24)**

| Defendants' Construction | Bid for Position's Construction |
|---|---|
| The terms "first bid" and "second bid" are used to distinguish one bid from another bid that is different from the first.<br><br>The terms "first bidder" and "second bidder" are used to distinguish one bidder from another bidder that is different from the first.<br><br>The terms "first" and "second" do not refer to time sequence. | "first" and "second" are used in the claim to distinguish two instances of the same thing. For example, "first bid" means a bid other than a "second bid," and "first bidder" means a bidder other than a "second bidder." The terms "first" and "second" do not refer to time sequence. |

The claims refer to the "first bidder" and the "second bidder," as well as to a "first bid" and a "second bid." The parties agree that "first" and "second" do not refer to time sequence. However, they disagree about whether the "first" and "second" bidder can be the same bidder, and whether the "first" and "second" bid can be the same bid.

The claim language itself shows that first and second are not meant to be the same. For example, the language refers to a "second bidder," not to "the first or some other bidder."

Similarly, it refers to a "second bid," not to "the first or some other bid." And claim 1 requires "checking for if a second bidder holds" the first bidder's "selected position of priority." (Ex. 1, 14:13-14). The inquiry, obviously, is whether someone *other* than the first bidder holds the position of priority selected by the first bidder.

Defendants' construction is also supported by the specification, which states that the "online bid management system 102 causes the relative priority for providing service to each bidder to exceed the priority for providing service with respect *to other bidders* so long as the maximum bid is not exceeded." (Ex. 1, 5:62-65, emphasis added). This indicates that the "second bid" originates with another bidder than the "first bidder." The Court should therefore adopt Defendants' proposed construction.

## VIII.   "Maintain" (Claim 1[a, d, e, f], 11[a, b, d, e], 23, 24)

| Defendants' Construction | Bid For Position's Construction |
|---|---|
| keep | Alternative 1: No construction necessary. Alternative 2: "continue or keep [a position]" |

This term is not a term of art and is properly understood in accordance with its plain meaning. Since this term can have several different meanings, depending on context, Defendants assert that this claim term requires construction.

In the context of the claims, the term means "keep." Indeed, this definition is consistent with the claim language and even Bid for Position's second alternative proposal which also uses the word "keep." Bid for Position's construction, however, introduces unnecessary ambiguity into the phrase. By including the alternative "continue" *or* "keep," Bid for Position provides two separate definitions for the phrase actually making the term less clear. The Court should construe the term "maintain" to simply mean "keep" as proposed by Defendants.[3]

---

[3]   Further, Bid for Position's bracketed text of [a position] renders the definition awkward if one were to attempt to use the definition in the claim, e.g. "position of priority that the first bidder wishes to [continue or keep [a position]] in the auction." The claim language specifies what is being "maintained" and Bid for Position's proposal of [a position], while not incorrect, is unnecessary.

## CONCLUSION

Defendants respectfully request that the Court adopt their construction of the disputed claim terms.

Dated: May 12, 2008

Respectfully submitted,

/s/_____
Stephen E. Noona
VSB No. 25367
*Counsel for Defendants Google Inc. and AOL LLC*
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com

Charles K. Verhoeven, *pro hac vice*
David A. Perlson, *pro hac vice*
Emily C. O'Brien, *pro hac vice*
Antonio R. Sistos, *pro hac vice*
Katherine H. Bennett, *pro hac vice*
*Counsel for Defendants Google Inc. and AOL LLC*
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700
charlesverhoeven@quinnemanuel.com
davidperlson@quinnemanuel.com
emilyobrien@quinnemanuel.com
antoniosistos@quinnemanuel.com
katherinebennett@quinnemanuel.com

Thomas D. Pease, *pro hac vice*
*Counsel for Defendants Google Inc. and AOL LLC*
QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
thomaspease@quinnemanuel.com

John M. Williamson, *pro hac vice*
**Counsel for Defendant AOL LLC**
FINNEGAN HENDERSON FARABOW GARRETT &
  DUNNER LLP
901 New York Avenue, NW, Suite 700
Washington, DC 20001
Telephone: (202) 408-4000
Facsimile: (202) 408-4400
john.williamson@finnegan.com

Robert L. Burns, II, *pro hac vice*
**Counsel for Defendant AOL LLC**
FINNEGAN HENDERSON FARABOW GARRETT &
  DUNNER LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
Telephone: (571) 203-2700
Facsimile: (202) 408-4400
robert.burns@finnegan.com


/s/_____
William D. Dolan, III
VSB No. 12455
**Counsel for Defendant Microsoft Corporation**
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182
Telephone: (703) 760-1684
Facsimile: (703) 821-8949
wddolan@venable.com

Richard A. Cederoth, *pro hac vice*
Laura L. Kolb, *pro hac vice*
**Counsel for Defendant Microsoft Corporation**
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
rcederoth@sidley.com
lkolb@sidley.com

/s/

Dana J. Finberg
VSB No. 34977
*Counsel for MIVA, Inc.*
LeClair Ryan, PC
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, VA 23219
Telephone: (804) 916-7109
Facsimile: (804) 916-7219
dana.finberg@leclairryan.com

Paul D. Ackerman, *pro hac vice*
Aasheesh Shravah, *pro hac vice*
*Counsel for MIVA, Inc.*
Dorsey & Whitney LLP
250 Park Avenue
New York, NY 10177
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
ackerman.paul@dorsey.com
shravah.aasheesh@dorsey.com

32

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

**Counsel for Plaintiff Bid For Position, LLC**
Craig T. Merritt (VSB No. 20281)
R. Braxton Hill, IV (VSB No. 41539)
Nichole Buck Vanderslice (VSB No. 42637)
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, VA 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com
bhill@cblaw.com
nvanderslice@cblaw.com

Gregory S. Dovel, *pro hac vice*
Christin K. Cho, *pro hac vice*
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069
greg@dovellaw.com
christin@dovellaw.com

David E. Rosen, *pro hac vice*
MURPHY ROSEN & MEYLAN, LLP
100 Wilshire Blvd., Suite 1300
Santa Monica, CA 90401
Telephone: (310) 899-3300
Facsimile: (310) 399-7201
drosen@mrmlawyers.com

**Counsel for Defendant Microsoft Corporation**
William D. Dolan, III (VSB No. 12455)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182
Telephone: (703) 760-1684
Facsimile: (703) 821-8949
wddolan@venable.com

Richard A. Cederoth, *pro hac vice*
Laura L. Kolb, *pro hac vice*
SIDLEY AUSTIN LLP
1 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
rcederoth@sidley.com
lkolb@sidley.com


**Counsel for Defendant MIVA, Inc.**
Dana J. Finberg (VSB No. 34977)
LECLAIR RYAN, PC
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
Richmond, VA 23219
Telephone: (804) 916-7109
Facsimile: (804) 916-7219
dana.finberg@leclairryan.com

Paul D. Ackerman, *pro hac vice*
Aasheesh Shravah, *pro hac vice*
DORSEY & WHITNEY LLP
250 Park Avenue
New York, NY 10177
Telephone: (212) 415-9200
Facsimile: (212) 953-7201
ackerman.paul@dorsey.com
shravah.aasheesh@dorsey.com

/s/_____
Stephen E. Noona
VSB No. 25367
*Counsel for Defendants Google Inc. and AOL LLC*
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 2100
Norfolk, VA 23510
Telephone: (757) 624-3000
Facsimile: (757) 624-3169
senoona@kaufcan.com