**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

BID FOR POSITION, LLC,

        Plaintiff,

        v.

AOL, LLC, GOOGLE, INC., MICROSOFT
CORP., and MIVA, INC.,

        Defendants.

CASE NO.  2:07-cv-582 JBF/TEM

**<u>Plaintiff Bid For Position, LLC's Brief in Opposition to
Defendants' Joint Opening Brief on Claim Construction</u>**

# **TABLE OF CONTENTS**

Page

I.  Introduction. .......................................................................................................... 1

II.  "first" and "second" ............................................................................................. 4

III.  "maintain" ............................................................................................................. 4

IV.  "information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction" (claim 1); and "selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction" (claim 11) ............................................................................................. 5

    A.  "entered by the bidder".................................................................................. 6

        1.  The claim language .............................................................................. 6

        2.  The specification.................................................................................. 6

    B.  "that indicates the bidder's express choice of" .............................................. 8

        1.  Claim language .................................................................................... 8

        2.  The specification.................................................................................. 9

        3.  Prosecution history ............................................................................ 11

            a. Prosecution argument No. 1 ........................................................ 11

            b. Prosecution argument No.2. ........................................................ 13

        4.  Inventor's statements ......................................................................... 14

    C.  Defendants' arguments concerning Bid For's proposed construction ................. 15

V.  "the selected position of priority"........................................................................ 17

    A.  Claim language............................................................................................ 17

    B.  Prosecution history...................................................................................... 18

    C.  Arguments regarding Bid For's proposal ........................................................ 19

VI.  "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder" ................................................................................................ 19

    A.  There is no dispute that a comparison is made as to whether the first bid exceeds the second bid .................................................................................. 19

    B.  Disputed issues 1, 2, and 3........................................................................... 20

    C.  Disputed issue 4: "from the first bidder" vs. "entered by the first bidder" .......... 20

        1.  The claim language ............................................................................ 20

        2.  The specification................................................................................ 21

        3.  Prosecution history ............................................................................ 21

VII.  "the auction for determining continuing priority for providing an ongoing service"....... 22

A.     The claim language ........................................................................ 23

B.     The specification ........................................................................... 23

C.     Arguments concerning Bid For's construction .............................. 24

VIII.   "wherein the relative position of priority for providing the service for the first
        bidder is dependent on whether the value of the first bid exceeds the value of the
        second bid, and wherein the relative position of priority for providing the service
        for the second bidder is dependent on whether the value of the second bid exceeds
        the value of the first bid" .......................................................................... 24

A.     The claim language ........................................................................ 25

B.     The specification ........................................................................... 26

C.     The prosecution history ................................................................. 27

D.     Support in the specification ........................................................... 27

IX.    "input device" ................................................................................................. 28

A.     The claim language ........................................................................ 28

B.     The prosecution history ................................................................. 28

X.     Conclusion ....................................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ........................................................ 11, 12

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007) ................................. 7, 9

*Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706
  (Fed. Cir. 1997) .................................................................................. 14

*Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124 (Fed. Cir. 2004) .............................. 30

*Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) ..................... 2

*Hyatt v. Boone*, 146 F.3d 1348, 1352, (Fed. Cir. 1998) ..................................... 27

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1120
  (Fed. Cir. 2004) .................................................................................. 1, 3

*Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1373-74 (Fed. Cir. 2004) .......................... 5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983
  (Fed. Cir. 1995) .................................................................................. 14

*Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1348
  (Fed. Cir. 2004) .................................................................................. 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361
  (Fed. Cir. 2008) .................................................................................. 5, 14

*Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006) ................................... 1

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................ 1, 2, 3 6, 7, 21, 24, 28,30

*Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906
  (Fed. Cir. 2005) .................................................................................. 2

*Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) ................................ 2

*Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ..................... 1,7

*United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir. 1988) ..................................... 11

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304, 1306
  (Fed. Cir. 2007) .................................................................................. 1, 3, 6, 18, 29

*Voice Techs. Group, Inc. v. VMC Sys.*, Inc., 164 F.3d 605, 615
  (Fed. Cir. 1999) .................................................................................. 14

## I.	Introduction.

Defendants' fundamental approach is contrary to every settled principle of claim construction.

### Ordinary and customary meaning of the words of the claim.

"[I]t is a 'bedrock principle' of patent law that <u>the claims of a patent define the invention</u> [and] the words of a claim are generally given their <u>ordinary and customary meaning</u>." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotes omitted, emphasis added)); *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1120 (Fed. Cir. 2004) ("subject to any clear and unmistakable disavowal of claim scope, the [claim term] <u>takes the full breadth of its ordinary meaning</u>" (emphasis added)), *expressly reaffirmed in Phillips*, 415 F.3d at 1312.

- Defendants never once assert that any of their proposed constructions constitute the ordinary meaning of a word or phrase.
- Defendants never once dispute that Bid For's proposed constructions do constitute the ordinary meaning of the words and phrases in the context of the claim.

Controlling law is also clear that dictionaries provide a reliable objective source for the ordinary and customary meaning of words. "[J]udges are free to consult dictionaries and technical treatises at any time." *Phillips*, 415 F.3d at 1322 (internal citation omitted). Dictionaries "can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1313)); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007) (holding that the ordinary meaning of a term is found in a dictionary definition and that "[Defendant's] proposed definition restricts the term . . . beyond this ordinary meaning"); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed. Cir. 2006) ("Here the specification does not define the term [in dispute]. Under these circumstances we appropriately look to dictionary definitions.").

Dictionaries are a key resource for ordinary and customary meaning because "a dictionary definition has the value of being an <u>unbiased source accessible to the public</u> in

advance of litigation." *Phillips*, 415 F.3d at 1322 (emphasis added). Significantly, with one exception ("input device"), Defendants do not offer any citations to dictionaries or treatises to support their proposed constructions.

While dictionaries are the best resource for objective ordinary meanings, *Phillips* made clear that dictionaries *alone* can never determine a claim construction. This is because "Dictionaries, by their nature, provide an expansive array of definitions . . . [and] different dictionaries may contain somewhat different sets of definitions for the same words." *Phillips*, 415 F.3d at 1321. To determine which of various potential ordinary meanings is correct, courts must always examine the context as found in (i) the claim language and (ii) the specification. "Under *Phillips*, the <u>rule that a court will give a claim term the full range of its ordinary meaning</u>, does not mean that the term will presumptively receive its broadest dictionary definition or the aggregate of multiple dictionary definitions. Rather, in those circumstances where reference to dictionaries is appropriate, the task is to <u>scrutinize the intrinsic evidence in order to determine the most appropriate</u> definition." *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (internal citations quotes omitted, emphasis added).

The first place to look when selecting the appropriate ordinary meaning is the claim language itself. "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *Phillips*, 415 F.3d at 1314 (internal citations and quotes omitted). Defendants repeatedly propose constructions at odds with the surrounding claim language.

The next place to examine is the specification. Because the "best source for discerning the proper context of claim terms is the patent specification," it is "the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. This does not mean, however, that a specification is likely to expressly state the ordinary meaning of words. Such instances are in fact rare. As a result, courts are prohibited from <u>substituting</u> the language of the specification for the language of the claim. "In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (internal quotes omitted); *Playtex*

*Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed. Cir. 2005) ( "The court must take care in its analysis, <u>when locating in the written description the context for a disputed term</u>, <u>not to import a limitation</u> from that written description." (emphasis added)).

Bid For used the specification for its proper purpose, as an aid to find the ordinary meaning of the words of the claim. By contrast, Defendants repeatedly propose substituting the language of preferred embodiments for the language of the claim.

**<u>When can the specification narrow ordinary meaning?</u>**

The specification can narrow the ordinary meaning of a claim in only two circumstances.

(1) *express lexicography*: "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess;" if so "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316.

(2) *clear disavowal*: the specification may contain "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* To overcome ordinary meaning, however, there must be a clear disavowal "using words or expressions of manifest exclusion or restriction." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).

Defendants never contend, much less establish, that any of their proposals are justified by a special definition or disavowal in the specification.

**<u>When can the prosecution history narrow ordinary meaning?</u>**

The prosecution history should also be consulted, but it is "less useful for claim construction." *Phillips*, 415 F.3d at 1317. Its limited role is to "exclude any interpretation that was disclaimed during prosecution." *Phillips*, 415 F.3d at 1317. "To operate as a disclaimer, the statement in the prosecution history <u>must be clear and unambiguous, and constitute a clear disavowal of scope</u>." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007) (emphasis added). Most statements in the prosecution history do not constitute a disavowal of claim scope. Instead, patentee's typically argue that the proposed claim language, *when given the full scope of its ordinary meaning*, distinguishes the claimed inventions from the prior art.[1] That is the case here. Defendants **never once contend** (much less establish) that any

_____

[1]       As an example of this concept: assume a claim included the word "hammer," and

of the prosecution history they cite constitutes an **unambiguous disavowal** of claim scope.

## II.     "first" and "second"

Defendants state that the parties "disagree about whether the 'first' or 'second' bidder can be the same bidder." Defs. 28. This is not the dispute. Bid For's construction is "first bidder" means a bidder other than a "second bidder." The sole dispute is whether the first and second bid can be different instances of the same thing (*e.g.* that a first bid and a second bid could both be $1). Bid For's opening brief cites controlling law showing that it can.

## III.     "maintain"

The parties agree that the word "keep" captures at least some of the meaning of "maintain." However, as shown in Bid For's opening brief, to capture that meaning fully in this context, we must also include "continue." *See, e.g.,* Ex. 4, *Dictionary.com Unabridged (v 1.1)* ("to keep in existence or continuance"); Ex. 2, *Webster's Dictionary* 1362 (3rd International ed. 2002) ("to persevere in : to carry on: keep up: continue"). This is particularly true where, as here, the asserted claim involves engaging in an ongoing activity (*i.e.*, jockeying for position in an online auction). To "maintain" in the context of an ongoing activity may involve "keeping" (in the sense that something is held on to) and/or "continuing" (in the sense that the holding on to may require some continued or ongoing action on the part of the keeper). Thus, the notion of "continue" is necessary to round out the construction of "maintain."

Though Defendants fight the inclusion of the word "continue" in the construction of "maintain," they do not dispute that "continue" forms part of the ordinary meaning of "maintain." Defendants also do not dispute the concept of "continuing" is applicable to "maintain" as used in the asserted claim.

---

the patentee distinguished prior art based on a rake by stating: "The claimed method uses a hammer, which can deliver force to a specific spot, whereas a rake diffuses the applied force over a broad area." In so doing, the patentee does not define hammer to mean "an implement that can deliver force to a specific spot." Nor does the patentee disavow the full ordinary meaning of hammer. Rather, the patentee argues that a feature or characteristic of "hammer," when interpreted with its full ordinary meaning, is sufficient to distinguish prior art. By contrast, if the claim language said "implement" and the patentee stated that the word "implement" as used in the claims means "hammer," then a clear disavowal of claim scope would have occurred.

Instead, Defendants argue that Bid For's construction adds "unnecessary ambiguity" by providing "two separate definitions for the phrase [maintain]." Defs. 29. The inclusion of more than one word in a proposed construction does not mean that construction provides two *definitions*. Rather it reflects that the ordinary meaning of the claim term cannot be fully captured by merely swapping in (1:1) a replacement word. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1373-74 (Fed. Cir. 2004) ("the district court's adoption of a definition attributed to . . . a synonym of the claim term, disregards entirely the distinction between the two terms").

Defendants have failed to raise any genuine basis for contesting Bid For's construction.

IV. **"information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction" (claim 1); and "selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction" (claim 11)**

Neither party asks the court to construe all of the words of this claim language (there is no need, for example, to construe "one of the two or more positions of priority"). Rather, the dispute here arises because Defendants ask the Court to include two limitations not found in the claim language: (1) "entered by the bidder," and (2) "that indicates the bidder's express choice."[2] Because Defendants' request these limitations, the Court must rule on them. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Accordingly, the Court's claim construction order as to this claim language should read: "The information need not be entered by the bidder. The information may be in a form that indicates the bidder's express choice of one of the two or more positions of priority, or it may be other information for selecting one of the two or more positions that the bidder wishes to maintain."

---

[2]    Perhaps to disguise that their proposed construction is a sharp departure from the claim language, Defendants mischaracterize the parties' dispute: "Defendants maintain that a bidder using the invention must be given *a choice of at least two or more positions of priority*, and that *the bidder* must do the selecting. Bid For Position apparently contends that neither is required by the claim language." Defs. 9 (emphasis in original). As to the former, there is no dispute: the claim language requires an auction with "two or more positions of priority" and Bid For has never suggested otherwise. As to the latter, Bid For disputes that the claim should be rewritten to include the limitations of "entered by the bidder" and "bidder's express choice."

## A.  "entered by the bidder"

Defendants propose that a construction must include "information entered by the bidder." Plaintiff proposes: "The information need not be entered by the bidder."

### 1.  The claim language

Defendants assert that "The claim language requires the 'information for selecting' to be entered by the bidder." Defs. 9. But the claim language contains no such requirement.

First, the phrase under construction does not address either the source of the "information for selecting" or how it is communicated. Significantly, however, that subject is addressed by other express claim language – "receiving bid management data from a first bidder." '151 at 14:6. When a concept is expressly addressed in other claim language, this strongly implies that the concept is not within the meaning of the term under construction. *Phillips*, 415 F.3d at 1314 ("the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel"); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007) ("The fact that such functions are mentioned separately when a 'server' is mentioned in the claims weighs against limiting a 'server' to one that performs the functions.").

Second, the portion of the claim that addresses the source of the "information for selecting" contains no such "entered by the bidder" limitation. The only limitation found in the claim language is that the bid management data must be "receiv[ed] . . . from the bidder." The claim language unambiguously imposes zero restriction as to how that information is received. Though the information could possibly be "entered by the bidder," it could just as possibly be entered by an agent for the bidder, or communicated orally and then entered by another party, et cetera. The claim language unambiguously contains no "entered by the bidder" limitation.

### 2.  The specification.

The specification does not contain any special definition or express disavowals of claim scope for the phrase under construction. In particular, nothing in the specification suggests that the invention is limited to situations where bid management information is "entered by the bidder." Accordingly, there is no basis for restricting the ordinary meaning of the claim

language.  *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ("We find nothing in the specification that would limit the meaning of the [claim] term[s]. . . The terms are not expressly defined in the specification, and there is nothing in the specification that suggests that it adopted a special definition of those terms.").

Defendants point to four passages from the specification.  Defs. 10-11.  But each of these passages is an example of a preferred embodiment, and each is found in the "Detailed Description of the Preferred Embodiments."  Examples from the preferred embodiments cannot be the basis for narrowing the ordinary meaning of the claim.  "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.  In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (internal citations omitted).  Because, "[t]he plain meaning of Claim 1 covers more than the particular embodiment," the language describing that embodiment cannot be imported into the claims.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007).  That is the end of the matter.[3]

Defendants – well aware that preferred embodiments cannot be used to narrow claims – attempt to disguise their argument as something other than an argument based on examples in embodiments.  Specifically, quoting from column 3, lines 40-44 of the specification, Defendants assert that this passage constitutes "a generic description of the invention."  Defs. 10.  This assertion suffers from an absence of candor.  The quoted passage is not a "generic description of the invention"; rather, it is expressly identified as "an exemplary system architecture for one embodiment of the present invention."  3:5-6 (emphasis added).  The specification does in fact contain a generic "Summary of Invention."  1:32-2:31.  But Defendants ignore that section

---

[3]  Moreover, in only two of the four examples quoted by Defendants does the specification say that position information is entered by the bidder.  Defs. 10-11.  The other two examples contain no limitation on how such information is received.  *Id.*

because it offers no support for "entered by the bidder" or any other construction proposed by Defendants. *Id*.

## B. "that indicates the bidder's express choice of"

Defendants' propose a construction that includes: "Information . . . that <u>indicates the bidder's express choice</u> of one of the two or more positions of priority." Bid For proposes: "The information may be in a form that indicates the bidder's express choice of one of the two or more positions of priority, or it may be other information for selecting one of the two or more positions that the bidder wishes to maintain."

### 1. Claim language.

Perhaps the most significant point regarding this issue is that Defendants themselves do not contend that their proposed limitation – "that indicates a bidder's express choice" – is found in the ordinary meaning of the claim language. Defs. 9. Indeed, it is not. Because there is no special definition or express disavowal of claim scope in the specification or prosecution history, the claim language takes the full scope of its ordinary meaning, and that ordinary meaning has no "express choice" limitation.

Moreover, the claim language *directly precludes* Defendants' central argument, that the "'selected position of priority' is chosen by the bidder, not the auction system." Defs. 16. The claim says that the system receives "bid management data" from the bidder. As written in the claim, it is clear that the system (<u>not</u> the bidder) then uses the bid management data. What does the system do with the data? The claim says that information in this data is used "for selecting one of the . . . positions of priority." Critically, it is the system (<u>not</u> the bidder) that is using this information to do the act of "selecting."

The plain language of the claim, therefore, precludes a construction that has only the bidder participate in "selecting one of the two or more positions." The scope of the claim language includes embodiments where the system receives a unique position number from a bidder, and embodiments where the system receives other bid management data (*e.g.* a maximum bid) from the bidder that the system then uses for selecting a position that is desired by the bidder.

### 2.    The specification.

Defendants' arguments based on the specification fail at three different levels.

*First*, once again, Defendants rely solely upon preferred embodiments.  Defs. 10-11.
Such embodiments cannot be the basis for adding a limitation not found in the claim language.
Because, "[t]he plain meaning of Claim 1 covers more than the particular embodiment[s]," the
language of those embodiments cannot be imported into the claims.  *Acumed LLC v. Stryker
Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007).

*Second*, nowhere – not even in the preferred embodiments quoted by Defendants – does
the specification limit the invention to a "bidders' express choice" of one position.  Neither the
word "express" nor any synonym appears in the specification.

*Third*, the specification makes quite clear that the invention does not require the
"express" choice by the bidder of a single "specific" position.[4]  To begin, Defendants principally
rely upon the following passage: "Another example allows the bidder to choose a position, such
as fourth in the results listing."  Def. 10 (quoting 4:55-56).  In presenting this quote, Defendants
intentionally omit the two sentences that immediately precede it.  Inserting those sentences, the
passage reads:

> "The system checks for whether the bidder's desired position is met for the
> particular web page and term, step 208.  For example, the system checks for
> whether the bidder's bid exceeds all other bids in the auction for determining
> continuing priority for listing the bidder's web page.  Another example allows the
> bidder to choose a position, such as fourth in the results listing."  '151 at 4:50-56.

Thus, in context, the specification makes clear that choosing a position "such as fourth" is
only "[a]nother example" of how the invention could be employed (not the whole invention).
And, more significantly, the primary identified example of the invention is for "the bidder's
desired position" to be selected when "the system checks to see if a bidder's bid exceeds those
from all others in a continuing auction for listing the bidder's web page" in search engine results.

---

[4]    For the phrase "selected position of priority," which is discussed in the next
section below, defendants propose the limitation of "specific" in addition to it being the
"bidder's express choice."  To support "specific," Defendants also rely upon this same "fourth in
the results" passage from the specification.  To avoid duplication, therefore, we will address here
both the issues of "specific" and "express."

'151 at 4:50-52. In this primary embodiment, bidders seek and are awarded the highest position they can obtain consistent with their maximum bid. 4:60-62.

Moreover, when the entire specification is read, it is clear that this highest-position embodiment is not some trivial extension that just barely resides within the periphery of the invention; rather it is the core use of the invention. The "Background of the Invention" describes that it is used for a "continuous auction" where "the search engine lists web-page search results for a key-phrase search in the order of bid prices" and "[t]he advertiser with the highest bid for a given key-phrase appears first in the list, the next highest bidder appears second, etc." The specification then describes in extensive detail how to build a system for using the invention to aid bidders in such auctions that seek and are assigned the highest position they can obtain up to a maximum bid. '151 at 3:4-5:18

Although Defendants' arguments fail, Defendants' proposed construction can nevertheless be read in a manner that is *consistent* with this highest-position embodiment of the invention. Specifically, a bidder in a multiple-position auction that chooses to seek the highest position it can obtain up to a maximum bid does in fact make an "express choice" – the bidder expressly chooses to used this "highest-position" method and expressly states a maximum bid. And the choice does result in the selection of a "specific position" desired by the bidder. Thus the definitions proposed by Defendants are *not inconsistent* with the "highest-position embodiment" of the invention.

But just because Defendants' square peg can, in this instance, be made to fit a round hole, this is not a valid reason for using the square peg. This is particularly true when we have a round peg – the claim language itself – available for use. One would never use the words "express choice" and "specific position" as the best way to describe this highest-position embodiment. And for that reason, the words "express choice" and "specific position" are <u>not</u> found in the claim. Rather, the actual claim uses language that perfectly encompasses the highest-position embodiment (as well as others): "received bid management data" is used "for selecting one of the two or more positions of priority that the first bidder wishes to maintain." '151' at 14:6-12.

### 3. Prosecution history.

Defendants make two unsuccessful prosecution history arguments.

#### a. *Prosecution argument No. 1*

Defendants quote the applicant's remarks that "the art does not teach a system or method that checks whether a bidder's bid was too high for a specific position of priority or ranking that a bidder wishes to maintain in an auction." Defs. 11 (quoting P686). Defendants then state that "the amendment made clear that the claimed invention had this feature." Defs. 11. From these two premises, the Defendants conclude: "for a system to maintain a 'specific position of priority' that a bidder wishes to maintain, the bid management information provided by the bidder must include the bidder's choice of a specific position (second, third, etc.)." Defs. 11-12. Every step in this argument is wrong.

**_First_, _Defendants have the wrong prosecution history_.** The prosecution statement quoted by Defendants addressed an amendment that included the following claim language: "the received bid management information *including a selected position of priority*." Exh. 11 [P681] (emphasis added). But that claim was rejected. Later, the applicant amended the claims to read: "the received bid management data *including information for selecting* one of the two or more positions of priority that the first bidder wishes to maintain." Exh. 12 [P725] (emphasis added). That is, the claim was changed from a method where the bid management data would include "a selected position of priority," to a method where it would instead include "information for selecting one" of the positions of priority. Accordingly, the prosecution remarks that Defendants rely upon relate to _proposed language that is not found in the issued claims_.

As a matter of law, these remarks have no relevance. "The arguments . . . which were made at the time the application claims explicitly contained such a limitation, cannot furnish a basis for restricting issued claim 1, which lacks any such limitation." *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir. 1988); *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1372 (Fed. Cir. 2003) ("A broadening claim amendment made during the prosecution history of the . . . patent supports a plain-meaning construction of claim 1

without a . . . limitation [contained in an earlier version of the claim]").  This certainly cannot amount to an unambiguous disavowal of claim scope.

**_Second_, Defendants draw exactly the wrong inference.**  Defendants assert that because the inventor amended the claim to go from the narrower "a selected position of priority" to the broader "information for selecting a position of priority," "the amendment made clear that the claimed invention had this [narrower] feature."  Defs. 11.  Defendants' inference in wrong, as a matter of law.  In fact, the law requires that we make the exact opposite inference – that the claim is not limited to the narrower proposed limitation.  *3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1372 (Fed. Cir. 2003) ("adding a limitation to a claim during prosecution and then removing it when the limitation failed to result in allowance of the claim over the prior art does not permit reading of limitation into claim when the claim issued without it").  Thus, as a matter of law, the claim cannot be interpreted so that it is limited to just bid information that is "a selected position of priority" from the bidder.

**_Third_, the relevant prosecution history shows express avowal, not disavowal, of claim scope.**  In the applicant's remarks discussing the actual claim language, there is no disavowal of claim scope.  Rather, the applicant quoted the claim language word for word and used that as the basis for overcoming the prior art.  When an applicant uses the claim language, given its full scope, as a basis for overcoming prior art, that is not an unambiguous disavowal of claim scope.  Rather that is an express avowal.  In particular, the applicant distinguished the prior are as follows:

> "Specifically, independent claims 1 and 11 have been amended to more clearly state that the claimed method or system is for an auction that has 'two or more positions of priority' available for bidding."  Exh. 12 [P732].

> "Specifically, Fisher fails to disclose or suggest at least the element that the auction has at least two or more positions of priority, and <u>the received bid management data includes information for selecting one of the two or more positions of priority that a bidder wishes to maintain in an auction.</u>"  Exh. 12 [P752] (emphasis added).

> Two points are significant about this prosecution history:

1.  The applicant emphasized that, unlike the prior art, in the claimed methods there were "two or more positions of priority" – *i.e.* that this was not like a traditional auction where the only winning position was first.  The applicant did <u>not</u> suggest (much less unambiguously, clearly, and expressly state) that the invention was novel because the selection was "entered by the bidder," or that the bidder made "an express choice" or that it included a "specific position."

2.  The applicant did not disavow any aspect of the ordinary meaning of the claim language.  Instead, the applicant directly quoted the claim language (including the language at issue) word for word, as a basis for overcoming prior art.  This is an express avowal.

***<u>Fourth</u>, Defendants' ultimate conclusion rests on false logic.***  Defendants conclude: "Of course, for a system to maintain a 'specific position of priority' that a bidder wishes to maintain, the bid management information provided by the bidder must include the bidder's choice of a specific position (second, third, etc.)." Defs 11-12.  That statement is false. Using the highest-position embodiment as an example, the bid management data includes <u>information that the system uses to select</u> a position of priority that a bidder wishes to maintain; the position being the highest that can be obtained.  Based on this information, the bidder is awarded a specific position, *i.e.*, 1, 2, or 8.  Then as subsequent iterations of the continuous auction occur, a system that uses the claimed invention will make sure that a bid from that bidder is adjusted up or down so that the bidder can maintain that specific position but not pay more than necessary for it.  All this happens without the bidder ever providing what the Defendants call a "choice of specific position (second, third, etc.)."

### b.      Prosecution argument No.2.

Defendants assert that, "the applicant amended the claims to the present form, requiring that 'the received bid management information data include information for selecting one of the two or more positions of priority.'  This amendment clarified that the bidder was, in fact, doing the selecting." Defs. 12.  This argument has it just backwards.  Nothing in the final claim language suggests that the bidder is doing the selecting.  To the contrary, the final claim language clarified that the bidder may <u>not</u> be doing the selecting.  Instead, bid management data will be received by the system, and the system will use that information "for selecting" one

position that the bidder wishes to maintain. Once again, there was no disavowal of claim scope, much less a disavowal that would support Defendants' position.

### 4. Inventor's statements.

Defendants quote from the inventor's deposition and state that "Konia's understanding of what the patent requires is consistent with Defendant's position." Defs. 12. This argument fails both as a matter of law and fact.[5]

*First*, the inventor's statements about his "understanding" of the claim scope are simply irrelevant as a matter of law. "The testimony of [the inventor] on the proper construction of the claims is entitled to no deference." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 983 (Fed. Cir. 1995); *id.* at 985 ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)"); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ("an inventor's self-serving statements are rarely relevant to the proper construction of a claim term"); *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) ("The testimony of an inventor and his attorney concerning claim construction is thus entitled to little or no consideration").

In a highly technical area, the inventor may be a qualified expert to submit expert testimony explaining the technology. That was the use made of the inventor's testimony in the one case cited by Defendants, *Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999). (Even that case affirmed that "the inventor can not by later testimony change the invention and the claims from their meaning at the time the patent was drafted and granted." *Id.*) But no such expert testimony was elicited in Mr. Konia's deposition. Rather, Defendants present the inventor's subjective understanding of the patent. Such statements have no relevance. In particular, they cannot be used to alter the scope of the express claim language.

---

[5] Defendants also cite portions of Mr. Konia's deposition when discussing other claim language as well. The same points made here, that such statements are irrelevant, apply to those other citations as well. To avoid duplication, however, Bid For presents these arguments only in this section.

*Second*, the deposition testimony quoted by Defendants does not, contrary to Defendants' implication, have anything to do with the claim language. The quoted testimony is merely a general description of "the patent."[6] Such a general description – *i.e.* encompassing all variations of the inventions disclosed in the patent – does not and cannot purport to be an explanation of the scope of the invention as found in a particular claim. By definition, every claim has a different scope. Accordingly, it is impossible for a single sentence description of "the patent" or "the invention" to be an accurate and precise description of the claim scope of any one claim (otherwise, all claims have the same scope).

### C.    Defendants' arguments concerning Bid For's proposed construction.

Defendants' argument concerning Bid For's proposal is based on false premises and logic. Defendants argue that "Virtually any auction enables bidders to do the best they can, consistent with their maximum bid." Defs. 13. Therefore, Defendants claim, what is unique about the '151 patent is that bidders "are given the ability to make an express choice among two or more positions of priority." *Id*. From this, Defendants conclude, "Getting only the highest position the bidder can afford, rather than actually selecting one of the two or more positions available, is precisely the subject matter that was surrendered when the applicant added the disputed claim language." *Id*.

Every statement in this argument is wrong.

*First*, whether "any auction enables bidders to do the best they can" is irrelevant. What is relevant is whether a bidder can obtain a winning position. In the traditional auction, such as found in the Fisher prior art, there is only one winning position. When the bidding exceeded a bidder's maximum bid, the bidder received no position of priority. By contrast, the method of

---

[6]    Moreover, the inventor's understanding of the claims is not "consistent with Defendants' position." Defs. 12. In fact, the inventor was never asked, during his deposition, to opine as to the meaning of the "information for selecting" claim language. Moreover, Defendants mischaracterize Mr. Konia's testimony. Mr. Konia did not testify that the ability to select a desired position by the bidder was "the alleged 'innovation'" (Defs. 12); rather he said it was "one of the features." 257:14-18. And when asked whether it is "a necessary requirement of the patent" that the position be "specified by the bidder," he responded, "not necessarily." 239:22-240:12.

the '151 claims is applied to auctions with multiple winning positions where bidder's typically seek to obtain the highest position of priority consistent with a maximum bid. That is impossible in the traditional auction.

**_Second_**, the '151 patent has a number of innovations and the principal one is not the option of selecting a single, non-contingent position. The principal innovation is a system that *automatically reduces* a bidder's bid to maintain a position of priority in an auction with two or more positions of priority. That was the distinction that the applicant emphasized over and over to the patent office:

> "Further, [the prior art] fails to disclose a system or method which automatically decrements or lowers a bid if the bid is found to be higher than needed to maintain a selected position of priority or ranking in an auction. This feature has particular significance in continuous type auctions, such as in search engines where bidders bid on advertising rankings for terms. . . . [U]sing the bid-reducing feature of the present invention, in the continuous auction context, savings may be even more pronounced as payments accumulate over time." Exh. 10 [P609-P610] (emphasis added).

> "Thus, independent claims 1 and 11 have been amended to recite a system or method for; "checking for whether the first bid is higher than needed to maintain the selected position of priority that the fist bidder wishes to maintain in the auction." and "if the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction, automatically reducing the first bid to a minimum which allows the bidder to keep the selected position of priority." In light of the above, Applicant believes that the §102 rejection of independent claims 1 and 11 has been traversed." Exh. 11 [P688] (emphasis added).

And that was the *express reason for allowance* by the patent office. The "examiner's statement of reasons for allowance" provides: "[t]he prior art of record fails to teach a method for automatically managing an auction for determining relative priority of a service in a system wherein priority is based on the relative value of related bids, comprising: an auction having at least two or more positions of priority, the received bid management data including information for selecting one of the two or more positions of priority that the first bidder wishes to maintain and automatically incrementing a first bid to a value exceeding the second bid if the first bid not exceed the second bid, to thereby maintain the selected position of priority and automatically reducing a first bid to a minimum which allows the bidder to keep a selected position of priority." Exh. 14 [P896-P897] (emphasis added).

Significantly, *not one of the limitations that Defendants seek to impose -- "express choice" by the bidder, "specific position," or "entered by the bidder" -- are mentioned in the examiner's reasons for allowance*.

**Third**, "getting only the highest position the bidder can afford," was never "surrendered" or disavowed, much less unambiguously disavowed during prosecution. As shown above, the prosecution history unambiguously establishes the opposite.

*    *    *

Bid For's proposal should be adopted and Defendants' rejected.

## V.    "the selected position of priority"

For this phrase, Defendants rely upon many of the same arguments they made as to the "information for selecting . . ." phrase. To avoid repetition, we address here only Defendants' additional arguments and make certain points that relate solely to this claim language.

All parties agree that each time the phrase "the selected position of priority" appears it refers back to step [a] and the position selected from the bid management data received from the first bidder. Defs. 15 ("The later references in the claim to 'selected position of priority' all build on this foundation."). For that reason, Bid For's proposal – "the position of priority selected from the bid management data received from the first bidder" – is unquestionably correct. Defendants find no fault with this aspect of Bid For's proposal. Defendants argue, however, that the Court should add a limitation not found in the claim: "specific position expressly chosen by the bidder." That would be improper.

### A.    Claim language.

Defendants' sole claim language argument is: "From the claim language itself, it is apparent that the bidder is the one that chooses the 'selected position of priority.' After all, the 'bid management data' is received 'from a first bidder,' and this 'bid management data' includes 'information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction.'" Defs. 15.

Defendants point to the right claim language, but reach exactly the wrong conclusion.

The patent claims unambiguously contain no limitation that selection is the result of an express choice entered by the bidder. Rather, the claim language states that the bidder's sole input on selection is to supply "bid management data" to the system. From that point forward, the system takes over and uses the information "for selecting one of the . . . positions." Thus, the claim cannot be limited to a position "expressly chosen by the bidder."

As for Defendants' "specific position" limitation, Defendants' acknowledge that it is found nowhere in the claim language. Defs. 15. Nor does the specification offer some special definition of claim language that includes the phrase "specific position." Accordingly, the only possible way for this phrase to find its way into the claim would be an unambiguous disavowal of claim scope in the prosecution history. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007). Defendants themselves do not contend that such an unambiguous disavowal took place. (Most of Defendants' prosecution arguments were addressed with respect to the "information for selecting" phrase; the remaining argument is addressed in below.) Accordingly, Defendants' proposal must be rejected.

### B. Prosecution history.

Defendants argue that when the applicant added the phrase "selected position of priority" to the claims, "the applicant directed the Examiner to the application, page 6, lines 15-19, as allegedly providing support." Defs. 15. Defendants assert that this cited "passage of the application provides that the bidder may 'choose a position, such as fourth in the search listing,' which is an example of the bidder expressly choosing a specific position." Defs. 15.

Once again, Defendants are mischaracterizing the prosecution history. The portion of the application that reads "allows the bidder to choose a position, such as fourth" is found at lines 14 to 15 of page 6. Exh. 8 at 6 [P412] (lines 14-15). If the applicant were intending to show that "the selected position of priority" required a <u>bidder's</u> express choice of position, the applicant certainly would have began his citation at line 14, which is where the word "bidder" appears. But the applicant cited lines 15-19, not 14-15. Accordingly, we *must infer just the opposite conclusion*: that the applicant did not intend that the selected position of priority required a bidder's express choice of position.

The portion actually cited by the applicant, lines 15-19, offers no support for Defendants' position and it further establishes that the focus of the amendment was that the system could <u>automatically reduce</u> a bid:

> "If the system finds that the bidder has achieved the proper position in the search engine with respect to the current term being processed, the system may reduce the bid to a minimum which allows the bidder to keep the position, step 210. Otherwise, the system increases the bid without exceeding the maximum bid entered by the bidder, step 212." Exh. 8 at 6 [P412] (lines 15-19)

In short, the prosecution history provides no unambiguous disavowal that supports Defendants' position. When the applicant addressed the issue of how a position was selected, the applicant did not say that it required a specific position expressly chosen by the bidder. Rather, the applicant repeated the language of the claim that "the received bid management data includes information for selecting one of the two or more positions." Exh. 13 at P752. The Examiner used that same language when explaining the reasons for allowance: "the received bid management data including information for selecting." Exh. 14 [P896].

### C.    Arguments regarding Bid For's proposal.

In addressing Bid For's proposal, Defendants make two weak arguments.

*First*, Defendants assert that Bid For "ignores the issue of who does the selecting." Defs. 16. That is incorrect. Bid For affirmatively asks the Court to reject Defendants' limitation and enter an order that selecting need not be by express choice entered by the bidder.

*Second*, Defendants' point out that Bid For's "construction is silent on who does the selection [and] permits the selection to be performed by the auction management system, the auction operator, or someone else." Defs. 16. True. And that is exactly the construction required by the claim language, when given the full scope of its ordinary meaning.

### VI.    "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder"

There are four differences between the parties' proposals. These are addressed in turn. But first we point out that the principal argument made by Defendants is not an issue at all.

### A.    There is no dispute that a comparison is made as to whether the first bid exceeds the second bid.

Defendants' principal argument is a red herring. Defendants assert: "Bid For Position's apparent position is that it is sufficient to 'check' the first bid and 'check' the second bid," but in fact "the claimed system does not merely (and uselessly) examine bid amounts entered by bidders; it compares the two bid amounts." Defs. 17, 20. Bid For has never contended that the system makes no comparison of bid amounts. Indeed, Bid For's proposal is: "checking [i.e. verifying, comparing, inspecting, or ascertaining] whether a first bid from the first bidder exceeds [i.e. is greater than] a second bid from the second bidder." No one could look at this proposal and conclude that no comparison is made between two bids.

Similarly, Defendants assert that Bid For's infringement contentions "ignore any notion that this limitation requires the bids to be compared." Defs. 20. That is false. The very page cited by Defendants states that the system "ascertains the value of the second bidder's max CPC bid and uses that as a standard for comparison, . . . [The] system checks for whether a first bid from the first bidder exceeds a second bid from the second bidder." Defs. exh. 7 at 24.

The real disputes center on Defendants' attempts to rewrite the claim language.

**B.     Disputed issues 1, 2, and 3.**

In its opening brief, Bid For explains (under the heading Disputed issues 1, 2 and 3) that: (i) the ordinary meaning of "checking" as used in this context is "verifying, comparing, inspecting, or ascertaining," and not "determining," (ii) the claim uses the phrase "a bid" and not the more limiting phrase "the bid," and (iii) the ordinary meaning of "exceeds" as used in this context is "greater than" and not "larger than." For each of these three disputed issues, **Defendants do not make a single argument either in favor of their proposal or against the proposal from Bid For**. As a result, there is simply nothing for Bid For to rebut in this brief, and Bid For's proposal should be adopted.

**C.     Disputed issue 4: "from the first bidder" vs. "entered by the first bidder"**

**1.     The claim language.**

Defendants do not try to establish that their proposal is the ordinary meaning of "from the first bidder." Defs. 17-18. While the word "from" has a number of meanings, none of them are "entered by." Exh. 15.

In fact, the structure of the claim language precludes Defendants' proposal. After "checking" the bid, the claimed system is designed to "automatically increment" or "automatically reduce" the first bid and to thereafter continue to perform the checking step. (Indeed, dependent claims 2 and 12 expressly require "checking and incrementing the first bid a plurality of times.") When the incremented or reduced bid is next checked, though the bid is still "from" the first bidder, the bid has not been "entered" by the first bidder. Instead, the bid has been "entered" by the system itself. Because the claim structure requires that the system be capable of performing the checking step after the first bid has been automatically incremented or reduced – that is, when it is not directly "entered by the bidder" – the claim language itself precludes Defendants' proposal.

## 2. The specification.

Defendants point to three passages from the specification (only two of which discuss a bid entered by a bidder). Defs. 18. But in each instance, Defendants merely point to examples of the invention found in the "Detailed Description of the Preferred Embodiments." *Id.* Such examples cannot be the basis for narrowing the scope of the ordinary meaning of the claim. "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (internal citations omitted). Therefore, nothing in the specification supports Defendants' position.

## 3. Prosecution history.

Defendants argue that the patentee "added 'from the bidder' to the claims in the August 4, 2003 Amendment, and, when doing so, cited to portions of the specification that "describe bidders entering bids into bidder terminals." Defs. 19. Thus, the Defendants argue, the patentee "unequivocally link[ed]" the "'from the bidder' claim language . . . to bids entered by the bidder at the bidder terminal." *Id.* Once again, Defendants mischaracterize the prosecution history.

*First*, the purpose of the August 4, 2003, Amendment was <u>not</u> to make clear that bids were "entered by a bidder." Rather, the amendment added the concept of "bid management data." Exh. 9 [P543]. The amendment was designed to "more clearly point out that <u>reception of</u>

such bid management data facilitates the claimed automated bidding process." Exh. 9 [P552]. And it was to support "these amendments" – *i.e.* bid management data – that the applicant cited the portions of the specification that Defendants now rely upon. *Id.*

*Second*, in those very same remarks the applicant emphasized that the purpose of the bid management data was to avoid the need for a bid "entered by the bidder." Rather, "the claimed system only initially requires bid management data so that the bidder may provide parameters for the automatic bidding. . . . This allows for the present invention to provide the significant advantage of unmonitored and automated bidding without the need for constant monitoring of the auction by each bidder." Exh. 9 [P551].

*Third*, the portion of the specification cited by the applicant, 3:36-52, expressly states that the checking step is not necessarily performed on a bid "entered by the bidder." That portion of the specification states that the "bid management system 102 will increment the lower bids" and that the "bid management system 102 is further programmed to check and increment the bids a plurality of times." '151 at 3:41-41, 3:49-51 (emphasis added). Necessarily, therefore, it will be checking bids that have been adjusted by the system and not "entered by the bidder." Thus rather than showing that the "from the bidder" claim language was unequivocally linked to "entered by the bidder," this portion of the specification unequivocally shows just the opposite.

## VII. "the auction for determining continuing priority for providing an ongoing service"

When we parse Defendants' proposal, we see that they are not really construing the entire claim phrase – most words of the phrase are simply reordered and/or re-tensed by Defendants (*e.g.*, "for determining" becomes "that determines"). The only word that has been substituted out by Defendants is "ongoing." So why then do Defendants purport to construe the entire phrase? Because it helps obscures the fact that their construction is utterly contrary to the ordinary meaning of the claim language.

Because the claim phrase is already in a form the jury can readily understand, and because the only word that Defendants actually propose to construe is "ongoing," the Court

should construe that word, and reject Defendants' reordering of the words and proposed additional limitation of "for each instance."

## A. The claim language.

Significantly, Defendants <u>do not even argue</u> that their proposal is consistent with the claim language. Defs. 24-26. Upon first receiving Defendants' proposed construction, Bid For interpreted it as substituting "priority for each instance" for the claim term "*continuing priority*." *See* Bid For's opening brief at 20-21. But Defendants' brief reveals that something else is going on. Nowhere in their brief do Defendants provide any support for including the phrase "for each instance" in the construction of this claim language. Instead, their arguments go solely to their use of the phrase "during a continuing period."

As a result, the phrase "for each instance" must be rejected out of hand. There is no language in the actual claim that translates to this phrase and Defendants make no effort to identify this as the ordinary meaning of any word or phrase found in the claim. Indeed, Defendants have failed to offer any basis for its inclusion. Likewise, as to "during a continuing period," Defendants point to nothing in the claim language, nor is there anything in the claim language, to suggest that this is a proper construction of the phrase "continuing priority." This is fatal to Defendants' proposal.

## B. The specification.

Defendants quote from the specification to show that the term "'priority' refers to the order of the bidders or the preference bidders receive." *Id.* But neither party seeks to construe the term "priority" itself, and this explanation does not support Defendants' view that "continuing" means "during a continuing period."

Next, Defendants claim that the specification's discussion of the goto.com system supports their construction. Defs. 15. This argument fails on three levels.

*First*, contrary to Defendants' misleading use of quotation marks around "continuing priority," Defs. 24, the specification does not use the phrase "continuing priority" to describe the goto.com system. '151 at 1:10-22.

*Second*, Defendants' citations to the specification of the *goto.com* patent are irrelevant. We are not construing the goto.com patent and there is nothing in that patent's specification that mentions "continuing priority."

*Third*, for the specification of the Bid For patent to support a construction that is contrary to the ordinary meaning of the claim language it must include either a special definition by the patentee (as "lexicographer") or a clear and unmistakable disavowal of the ordinary meaning or claim scope. *Phillips,* 415 F.3d at 1316. Because Defendants do not contend that such a special definition or disavowal exists, it is improper to depart from ordinary meaning.

### C. Arguments concerning Bid For's construction.

Defendants criticize Bid For's proposed constructions as "circular." Def's at 25. Defendants fail to articulate how Bid For's constructions are "circular" or why circularity in this context is improper. As shown in its opening brief, Bid For's constructions represent the ordinary meaning of the claim language based on the objective sources cited.

Defendants also argue that Bid For's proposed construction "leaves unresolved the central dispute over claim scope: is 'continuing priority' different from 'priority,' and if so, how?" Defs at 26. To start with, there is no disagreement that "continuing priority" means something different than just "priority." Defendants have set up a straw man. To read their brief, one would think Bid For had proposed to read the term "continuing" out of the claim – but that is not the case at all. Bid For's proposal – "continuing priority" means "ongoing priority" – does not eliminate or even blur the boundary between "priority" and "continuing priority." Instead, it accurately reflects the ordinary meaning of that phrase in context.

### VIII. "wherein the relative position of priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and wherein the relative position of priority for providing the service for the second bidder is dependent on whether the value of the second bid exceeds the value of the first bid"

The claim language (sensibly) covers an auction where the numerical <u>amount</u> bid by one bidder can have a different <u>value</u> to the system than if the same amount were bid by another bidder. For example, if first bidder bids $5 dollars and second bidder bids 10 yen, the *numerical*

*amount* of the second bid is higher than the numerical amount of the first bid, but the *value* of the first bid is greater than the second. Because their systems operate precisely in this manner, Defendants seek to rewrite the claim to change "value" to "amount." But the claims use the word "value" and not "numerical amount" or "amount." Absent a special definition or unambiguous disavowal in the specification or prosecution history, that claim language governs. *Phillips,* 415 F.3d at 1316. Defendants do not even assert (much less establish) that such a disavowal took place. That is the end of the matter. *Id*.

Defendants' unsuccessful arguments are rebutted in turn.

## A. The claim language.

Defendants assert: "Defendants' proposed construction adheres to the plain meaning of the claim language: a bid with a higher bid amount has a greater 'value' than a bid with a lower bid amount, pure and simple." Defs. 22. This one sentence reveals much about Defendants' position. Defendants cite no authority for the proposition that the "plain meaning" of "value" is "amount," because none exists. And Defendants provide no analysis, because analysis quickly disproves the point -- a bid of 10 yen has a higher numerical amount, but not a greater value than a bid of $5 dollars. Defendants' sole effort at persuasion is rhetorical, adding the tag "pure and simple" at the end of the sentence. But rhetoric does not make it so.

Defendants next make an unsuccessful argument based on the surrounding claim language. Defendants point out that, in claim 1, the phrase "automatically incrementing the first bid to a value exceeding the second bid if the first bid does not exceed the second bid" contains the word "value" in the first part of the phrase, but not in the remainder of the phrase. That is, the end of the phrase does not say "if the *value of* the first bid does not exceed the *value of* the second bid." From this, Defendants conclude "this limitation equates 'value' with bid amount, and leaves open no other interpretation." Defs. 22. This argument is simply illogical. An equation of "value" with "amount" would occur only if the claim phrase read: "automatically incrementing the first bid to a value exceeding the second bid if *the amount of* the first bid does not exceed *the amount of* the second bid." But it contains no such language.

Moreover, if we properly analyze this claim language in context, it refutes Defendants' argument. If we read the phrase "first bid does not exceed the second bid" in isolation and out of context, then we cannot tell for sure what it means for one bid to "exceed" another. It could mean greater value or it could mean higher numerical amount. (The most logical construction, of course, is "value," because that is what matters in an auction.) But we do not need to wonder, because when we put the phrase back in context, the claim explicitly says "value," thus making it clear that a comparison of value, not numerical amount, is what matters.

In fact, the very reason the phrase under construction is included in the claims is to make clear that it is relative value that matters, not numerical amount. The phrase under construction is a "wherein" clause. It does not add an additional step or limitation. Rather, it is solely intended to clarify the limitation to which it is attached, *i.e.* to clarify the circumstances under which "a first bid from the first bidder exceeds a second bid from the second bidder in the auction for determining continuing priority." '151 at 14:15-18. And this "wherein" clause explicitly and unambiguously says that it is "value" – not numerical amount – that matters.

**B.     The specification.**

Defendants point to four passages from the specification. Each one of them, however, supports Bid For's proposal and refutes Defendants'.

First, Defendants point out that, in the Summary of the Invention, the patentee equated "the relative value of related bids" with "whether a first bid exceeds a second bid." Defs. at 21 (quoting 1:33-39.) That is true. But it proves Bid For's point: that one bid "exceeds" another if it has a greater "value," not a higher "amount." The patentee explicitly avoided using the word amount and, instead, chose "relative value." Defendants admit that this passage is particularly powerful because it "describes the overall inventions." Defs. 22 (quoting *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004)). Thus, the specification powerfully proves (not disproves) that the claim compares the value of the bids, not the amount of the bids.

For passages 2, 3, and 4, Defendants turn to preferred embodiments, which, of course, cannot be used to limit the ordinary meaning of the claim language. But even the passages selected by Defendants do not support their position. Passage 2 includes "whether their bids

exceeds the value of other bids," which again establishes that it is value, and not amount, that matters.  Defs. 22 (quoting 3:29-32).  Passage 3 also uses the term "values" and avoids using "amount."  Passage 4 does not use either the term "value" or "amount" and, therefore, in isolation, would be ambiguous.  Defs. 22 (quoting 3:62-64).  But in context, this passage refers to "the embodiment of Fig. 1" (3:53), which the specification clearly describes as one where priorities are based on "the value of other bids."  3:29-32.

Defendants ignore perhaps the most telling point on the issue: the specification contains not one example of awarding priorities based on a straight comparison of numerical amounts.

### C.      The prosecution history.

Defendants quote interim claim language that contained the phrase "incrementing the first bid to a value not exceeding the second bid if the first bid does not exceed the second bid." Defs. 22 (quoting P476).  If this were relevant, it would establish that a bid "exceeds" another bid if the first bid has a greater "value" (not "amount").  But this passage is irrelevant because it is not a disavowal of claim scope.

### D.      Support in the specification.

Defendants argue that "if the Court were to adopt Bid for Position's proposed construction, the claims would be invalid for failure to satisfy the 'written description' requirement" because "the specification does not show that the inventor had possession of . . . the full scope of the claimed subject matter."  Defs. 23.  This argument is frivolous.

The specification expressly and repeatedly describes the awarding of priorities based on the relative value of the bids, including in the Summary of Invention.  1:36-50 ("priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid").  All of the embodiments make use of "relative values." E.g., 3:9-10; 4:23-25; 5:25-26; 6:37-38; 7:19-20; 10:44.  Moreover, a claim element automatically satisfies the written description requirement if it was found in the originally proposed claims.  *Hyatt v. Boone*, 146 F.3d 1348, 1352, (Fed. Cir. 1998) ("The claims as filed are part of the specification, and may provide . . . compliance with Section 112").  The exact claim language at issue was included in the originally proposed claims.  Exh. 8 [P427].

IX.    **"input device"**

　　A.    **The claim language.**

We start with the heavy presumption that "input device" should be given its ordinary meaning in this context. *Phillips*, 415 F.3d at 1312. As shown in Bid For's opening brief, the ordinary meaning of input device, as used in the context of Claim 11, is "a device for transferring data into a processor system." *See, e.g,* Ex. 6, *Oxford Dictionary of Computing*, 262 (5th ed. 2004) ("Any device that transfers data, programs, or signals into a processor system").

The closest Defendants come to considering the ordinary meaning is to argue that their construction is "consistent with the common usage" and to quote the following definition: "peripheral device whose purpose is to allow the user to provide input to a computer system. Examples of input devices are keyboards, mice, joysticks, and styluses." Defs. 27. Defendants have cherry-picked a definition that mentions the "user" of the device. To determine whether this definition is appropriate here, we examine "the context of the surrounding words of the claim." *Phillips*, 415 F.3d at 1314 (internal quotes omitted).

The phrase "input device" appears in the following context: "an input device for receiving bid management data from a first bidder." Thus the phrase "input device" does not refer to a device on the *entry* side, such as a keyboard, that is used by a bidder to enter information. Rather, it refers to a device that is part of the system on the *receiving* side and is used "for receiving bid management data." Accordingly, in context it is clear that "input device" cannot be, as quoted by Defendants, a "peripheral device [such as a keyboard] whose purpose is to allow the user to provide input." By contrast, the definition quoted by Bid For perfectly fits this context.

Significantly, even Defendants' cited definition does not contain the geographical limitation – "at the bidder's location" – that Defendants seek to add. Nor is this limitation found in any other objective source of the ordinary meaning of input device.

　　B.    **The prosecution history.**

Defendants argue: "The reference to 'input device' in Claim 11 was added during prosecution;" and "to persuade the Examiner that this new claim limitation was supported by the

specification, the applicant specified where the claimed 'input device' was discussed in the specification. Significantly, all of the references were to data entry devices at the bidder location." Defs. 26. This argument fails at three different levels.

*First,* Defendants mischaracterize the prosecution history. Defendants are correct that "input device" was added in an August 4, 2003, amendment, but the suggestion that this phrase played any role in the prosecution is simply not true. As discussed above (in connection with the "checking" limitation), the purpose of the August 4, 2003, Amendment was to add the concept of "bid management data." Exh.9 [P543]. As the patentee stated, the amendment was designed to "more clearly point out that <u>reception of such bid management data</u> facilitates the claimed automated bidding process." *Id.* [P552] (emphasis added). The only significance of the "input device" is that it is the part of the system that "receiv[es] bid management data." And it was to support "these amendments" – *i.e.* adding bid management data – that the applicant cited the portions of the specification that Defendants now rely upon. *Id.*

Significantly, neither "input device" nor "bidder terminal" <u>were ever discussed</u> by either the applicant or the Examiner. Because "input device" did not play a role in the prosecution, there was certainly no "clear disavowal of scope" as to that phrase. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007). And without such a disavowal, the prosecution history becomes irrelevant. *Id.*

*Second*, the portion of the specification cited by the applicant, 3:36-52, describes an embodiment that more closely supports Bid For's construction that it does Defendants' construction. It states "The online bid management system 102 keeps track of the maximum and minimum bids for each user who enters bids into the bidder terminals 175 <u>into RDBMS</u> 104." '151 at 3:38-40 (emphasis added). The phrase that most naturally accords with an "input device for receiving bid management data" is not the "bidder terminal," but rather the "RDBMS" ("relational database management system"). The RDBMS is an input device that "receives" bid management data from the bidder terminals.

*Third,* had the applicant cited a "bidder terminal" as the sole support in the specification for "input device," and had that been the only support for input device (two things that are not

true) the written description requirement still would not require that "input device" be construed to cover only a bidder terminal. *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1124 (Fed. Cir. 2004) ("That a claim may be broader than the specific embodiment disclosed in a specification is in itself of no moment . . . this court has continued to apply the rule that disclosure of a species may be sufficient written description support for a later claimed genus including that species" (internal citation omitted)). Moreover, we would be prohibited from doing so under fundamental principles of claim construction. *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").

## X. Conclusion.

For the foregoing reasons, Bid For's constructions should be adopted and the Defendants' constructions rejected.

Dated: June 2, 2008

Respectfully submitted,

BID FOR POSITION, LLC

By Counsel

/s/
R. Braxton Hill, IV (VSB No. 41539)
bhill@cblaw.com
Craig T. Merritt (VSB No. 20281)
Nichole Buck Vanderslice (VSB No. 42637)
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: 804-697-4100
Facsimile: 804-697-4112

Gregory S. Dovel, *p.h.v*
Christin Cho, *p.h.v*
Dovel & Luner, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
Telephone: 310-656-7066
Facsimile: 310-657-7069

David Rosen, *p.h.v*
Murphy Rosen & Meylan LLP
100 Wilshire Boulevard Suite 300
Santa Monica, CA 9040l
Telephone: 310-899-3300
Facsimile: 310-399-7201

ATTORNEYS FOR BID
FOR POSITION, LLC

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 2, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard A Cederoth
*Attorney for Microsoft Corp.*
Sidley Austin LLP
1 S Dearborn St
Chicago, IL 60603
(312) 853-7000
(312) 853-7036 (fax)
Email: rcederoth@sidley.com

William David Dolan, III
*Attorney for Microsoft Corp.*
Venable LLP
8010 Towers Crescent Dr
Suite 300
Vienna, VA 22182-5601
(703)760-1684
(703) 821-8949 (fax)
Email: wddolan@venable.com

David Andrew Perlson
*Attorney for Google, Inc.*
Quinn Emanuel Urquhart Oliver & Hedges
50 California St
22nd Floor
San Francisco, CA 94111
(415) 875-6600
(415) 875-6700 (fax)
Email: davidperlson@quinnemanuel.com

Stephen Edward Noona
*Attorney for Google, Inc.*
Kaufman & Canoles PC
150 W Main St
PO Box 3037
Norfolk, VA 23510
(757) 624-3239
Email: senoona@kaufcan.com

Robert L. Burns
*Attorney for AOL, LLC*
Finnegan, Henderson, Farabow,
Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700
(202) 408-4400 (fax)
Email: robert.burns@finnegan.com

Stephen Edward Noona
*Attorney for AOL, LLC.*
Kaufman & Canoles PC
150 W Main St
PO Box 3037
Norfolk, VA 23510
(757) 624-3239
Email: senoona@kaufcan.com

Paul Douglas Ackerman
*Attorney for MIVA, Inc.*
Dorsey & Whitney, LLP
250 Park Avenue
New York, NY 10117
(212) 415-9200
(212) 953-7201 (fax)
Ackerman.paul@dorsey.com

Dana Johannes Finberg
*Attorney for MIVA, Inc.*
LeClair Ryan PC
PO Box 2499
Richmond, VA 23218-2499
(804) 916-7109
(804) 916-7219 (fax)
Email: dana.finberg@leclairryan.com

_____/s/_____

R. Braxton Hill, IV (VSB 41539)
*Attorney for Bid for Position, LLC*
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone:      (804) 697-4100
Facsimile:      (804) 697-4112
Email: bhill@cblaw.com

877150