IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

JUL 1 1 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

BID FOR POSITION, LLC,

Plaintiff,

v.                                                          Civil Action No. 2:07cv582

AOL, LLC,
GOOGLE. INC., and
MIVA, INC.,

Defendants.

## ORDER AND OPINION

On June 9, 2008, the court conducted a <u>Markman</u> hearing for the purpose of construing

the claims in the plaintiff's patent at issue. After careful consideration of the briefs submitted by

the parties, and the argument of counsel at the hearing, the court issues this Order and Opinion

detailing the claims constructions and reasons therewith.

## I. Factual and Procedural Background

The United States Patent and Trademark Office issued Patent No. 7,225,151, entitled

"Online Auction Bid Management System and Method" (hereinafter "the '151 patent"), to the

inventor, Brad Konia on May 29, 2007. Bid for Position is a company created by the inventor to

deal with the patent licenses, and is the owner of all rights, title, and interest in the '151 patent.

On December 13, 2007, Bid for Position, LLC brought this instant action alleging patent

infringement in violation of the federal patent laws of the United States, 35 U.S.C. § 271, <u>et seq.</u>

In its complaint, Bid for Position alleges that AOL, LLC, Google, Inc., Microsoft Corp., and

Miva, Inc., infringed upon the '151 Patent. Bid for Position specifically asserts that Google,

AOL, and Microsoft infringe on claims 1-4, 11-14, and 23 of the '151 patent, and that Miva

infringes upon claims 1 and 11 of the '151 patent. Google, AOL, and Miva allege three

counterclaims against Bid for Position, seeking a declaratory judgment of noninfringement, a

declaratory judgment of invalidity of the '151 patent, and a declaratory judgment of

unenforceability of the '151 patent. During the <u>Markman</u> hearing on June 9, 2008, Microsoft

indicated to the court that Bid for Position and Microsoft had settled their dispute over the '151

patent, and that Microsoft would be dismissed as a party to this case. On July 3, 2008, the court

entered an order dismissing Bid for Position's claims against Microsoft and Microsoft's

counterclaims against Bid for Position. Miva and Bid for Position have also notified the court

that they have reached a settlement and that Miva would no longer be a party to this action. As

of the date of this opinion and order, however, the court has not received an agreed order from

the parties to dismiss Bid for Position's claims against Miva and Miva's counterclaims against

Bid for Position.

## II. Claim Construction Procedure

It is well-settled that a determination of infringement requires a two-step analysis: "[f]irst,

the court determines the scope and meaning of the patent claims asserted . . . [and secondly,] the

properly construed claims are compared to the allegedly infringing device." <u>Cybor Corp. v. FAS

Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (<u>citing</u> <u>Markman v. Westview

Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996)). "It is a

'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir.

2005) (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111,

1115 (Fed. Cir. 2004)); <u>see also</u> <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed.

Cir. 1996) ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention.").

A.  Claim Construction Principles

The Federal Circuit has repeatedly stated that "the words of a claim 'are generally given their ordinary and custom meaning,'" and that "the ordinary and custom meaning of a claim is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (quoting Vitronics, 90 F.3d at 1582). This provides "an objective baseline from which to begin claim interpretation" and is based upon on "the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. As noted by the Federal Circuit

> It is the person of ordinary skill in the field of the invention whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decision making process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Mulitform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998). However, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting Phillips, 415 F.3d at 1314). Finally, when construing claim terms and phrases, the court cannot

rewrite the claims, nor can the court add or subtract words from the claims. See SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005); Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims.").

B.      Types of Evidence to Consider

In determining the meaning of disputed terms or phrases, the court should first examine the claim and the specification. The Federal Circuit stated that "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and "because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id.

The claims, however, "do not stand alone" and "must be read in vew of the specification, of which they are a part." Id. at 1315; see also Vitronics, 90 F.3d at 1582 (stating that the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of the disputed term."); Multiform Dessicants, 133 F.3d at 1478 (stating that "the best source for understanding a technical term is the specification from which it arose, informed as needed, by the prosecution history"). The specification, as required by statute, describes the manner and process of making and using the patented invention, and thus, "the claims must be construed so as to be consistent with the specification, of which they are a part." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003); see also Markman v. Westview Instruments, Inc., 517 U.S. 370, 389 (1996) ("[A claim] term can be defined only in a way that comports with the instrument as a whole."); Phillips, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a

4

special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.").

In addition to the claim and specification, the court should consider the prosecution history, which consists of the complete record of the proceedings before the Patent and Trademark Office, and includes the prior art cited during the examination of the patent. Phillips, 415 F.3d at 1317 (citing Autogiro Co. of America v. United States, 384 F.2d 391, 399 (Ct. Cl. 1967)). The prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317 (citing Vitronics, 90 F.3d at 1582-83); see also, Chimie v. PPG Indus. Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

The court may also examine extrinsic evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Technical dictionaries may provide a better understanding of the underlying technology and the way in which one of skill in the art might use the claim terms. Phillips, 415 F.3d at 1318; Vitronics, 90 F.3d at 1584 n.6. Expert testimony can be useful "to provide a background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of the person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318; Pitney

Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1308-09 (Fed. Cir. 1999). However, "while extrinsic evidence 'can shed useful light on the relevant art,' [the Federal Circuit has] explained that it is 'less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" Phillips, 415 F.3d at 1317 (quoting C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)). Finally, with respect to general usage dictionaries, the Federal Circuit noted that "[d]ictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used . . . in claim construction," and "a dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" Phillips, 415 F.3d at 1322 (quoting Vitronics, 90 F.3d at 1585).[1] However, the Federal Circuit cautions that "'a general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term," that "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent," and "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d 1322 (quoting Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)). Additionally, "different dictionary definitions may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based

---

[1]In Phillips, the Federal Circuit expressly discounted the approach taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F. 3d 1193 (Fed. Cir. 2002), in which the court placed greater emphasis on dictionary definitions of claim terms. Phillips, 415 F.3d at 1319-1324 ("Although the concern expressed by the court in Texas Digital was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."). The Federal Circuit reaffirmed the approach in Vitronics, Markman, and Innova as the proper approach for district courts to follow in claim construction, but acknowledged that there was "no magic formula" for claim construction, and that a court is not "barred from considering any particular sources . . . as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Phillips, 415 F.3d at 1324.

upon the preferences of a particular dictionary editor, . . . uninformed by the specification, to rely

on one dictionary rather than another." Id.

Therefore, with these principles in mind, the court will now examine the patent and the

disputed claim terms.

### III. The '151 Patent

There are two independent claims in the patent, claims 1 and 11. The remaining claims,

2-10 and 12-24, are dependent claims. The disputed terms appear in claims 1 and 11, and

therefore, they are the only claims reproduced below:

Claim 1:

    A method for automatically managing an auction for determining relative priority for a
service in a system wherein priority is based on the relative value of related bids, comprising:
        receiving bid management data from a first bidder for managing bidding by the first
            bidder in the auction, the auction having at least two or more positions of priority,
            the received bid management data includes information for selecting one of the
            two or more positions of priority that the first bidder wishes to maintain in the
            auction;
        checking for if a second bidder holds the selected position of priority, and
        checking for whether a first bid from the first bidder exceeds a second bid from a second
            bidder in the auction for determining continuing priority for providing an ongoing
            service for the first and second bidder, wherein the relative position of priority for
            providing the service for the first bidder is dependent on whether the value of the
            first bid exceeds the value of the second bid, and wherein the relative position of
            priority for providing the service for the second bidder is dependent on whether
            the value of the second bid exceeds the value of the first bid;
        according to the bid management data received from the first bidder, automatically
            incrementing the first bid to a value exceeding the second bid if the first bid does
            not exceed the second bid, to thereby maintain the selected position of priority for
            providing the service for the first bidder;
        checking for whether the first bid is higher than needed to maintain the selected position
            of priority that the first bidder wishes to maintain in the auction; and
        if the first bid is higher than needed to maintain the selected position of priority that the
            first bidder wishes to maintain in the auction, automatically reducing the first bid
            to a minimum which allows the bidder to keep the selected position of priority.

Claim 11:

    A system for automatically managing an auction for determining relative priority for a

service in a system wherein priority is based on the relative value of related bids, comprising:

an input device for receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, the auction having at least two or more positions of priority, the received bid management data including selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction;

a processor electrically connected to a network for checking for if a second bidder holds the selected position of priority, and for checking for whether a first bid from the first bidder exceeds a second bid from a second bidder in the auction for determining continuing priority on a server electrically connected to the network for providing an ongoing service for the first and second bidder, wherein the relative position of priority for providing the service for the first bidder is dependent on whether the value of the first bid exceeds the value of the second bid, and wherein the relative position of priority for providing the service to the second bidder is dependant on whether the value of the second bid exceeds the value of the first bid, and for automatically incrementing the first bid according to the bid management data received from the first bidder to a value exceeding the second bid if the first bid does not exceed the second bid, to thereby maintain the selected position of priority for providing the service for the first bidder; and

a database electrically connected to the processor for storing the first and second bids;

the processor further for checking for whether the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction,

the processor further for automatically reducing the first bid to a minimum which allows the bidder to keep the selected position of priority if the first bid is higher than needed to maintain the selected position of priority that the first bidder wishes to maintain in the auction.

## IV. The Claim Terms and Phrases

The parties have agreed to the construction of four terms and phrases in the claims. The parties disagree as to the construction of six terms and phrases that appears in claims 1 and 11 in the '151 patent.

### A. Agreed Construction of Claims in Patent

In their Joint Statement on Claim Terms in Controversy, the parties have agreed that the term "bid" means "an offer of a price," and that the phrase "incrementing the first bid" means "increasing the first bid." During the hearing on June 9, 2008, the parties came to an agreement

as to the construction of the claim terms "first" and "second," and the claim term "maintain."

The parties agreed to the following construction for the claim terms "first" and "second:"

> **"First" and "second" are used in the claim to distinguish two instances of the same thing. "First bid" means a bid other than a "second bid," and "first bidder" means a bidder other than a "second bidder." The terms "first" and "second" do not refer to time sequence.**

As to the term "maintain," the parties are all in agreement that the claim term does not need to be construed.

> B. <u>"information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction" and "selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction"</u>

The first phrase appears in claim 1, and the second, similar phrase appears in claim 11. The defendants assert that these phrases should be construed to mean "information entered by the bidder that indicates the bidder's express choice of one of the two or more positions of priority in the auction." Bid for Position does not provide a construction of this phrase, and objects to the use of "entered by the bidder" and "bidder's express choice" in the defendants' construction.

Examining this phrase in the context of the claim language, several aspects of this phrase become apparent:

- receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, the auction having at least two or more positions of priority, the received bid management data including <u>information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction.</u> '151 Patent 14:6-12.

- an input device for receiving bid management data from a first bidder for managing bidding by the first bidder in the auction, the auction having at least two or more positions of priority, the received bid management data including <u>selected one of the two or more positions of priority that the first bidder wishes to maintain in the auction.</u> '151 Patent 15:8-14.

9

First, the bid management data, is provided by the bidder, as is evidenced by the first portion of the claim language: "receiving bid management data from the first bidder." Second, the phrase explains that the bid management data that is received includes the information for selecting the positions of priority that the bidder wants to maintain in the auction. The phrase "the first bidder wishes to maintain in the auction" indicates that the bidder, not the system, chooses the position of priority in the auction.

The specification also provides additional insight by further emphasizing who provides the bid management data, and clarifying what is included in the bid management data :

- A User may enter a bid into the online bid management system through a bidder terminal, which transmits the bid to the bid management server. '151 Patent 3:22-26, 5:39-43. 7:33-38, 9:36-41, 12:25-41.

- Bidders may further enter maximum and/or minimum bids into the bidder terminals. '151 Patent 3:36-37, 5:53-54, 7:48-50, 9:52-54, 12:46-47.

- The online bid management system will increment the lower bids until they reach the desired bidding positions entered by the bidders as long as the bids do not exceed maximum values entered by the respective bidders. '151 Patent 3:40-44, 5:58-61, 7:53-57, 9:57-62, 12:52-56.

- The system checks for whether the bidder's desired position is met for the particular web page and term. For example, the system checks for whether the bidder's bid exceeds all other bids in the auction for determining continuing priority for listing the bidder's webpage. Another example allows the bidder to choose a position, such as fourth in the results listing. '151 Patent 4:50-56, 6:46-52, 8:46-55, 10:53-61.

As seen above, the bid, the maximum and/or minimum bid, and the desired bidding position are all "entered by" the bidder, golfer, vendor, or frequent flyer. This information is the bid management data that informs the system of how to manage the bidder's bidding in the auction.

10

The system does not know what position to bid for or how to manage that bid until the bidder provides that information. It is the bidder that chooses a desired bidding position, whether that position is the premium position or some other bidding position. This is particularly evident in the examples provided for in the preferred embodiments:

> On their reservation servers, golf courses may rank premium tee-off times based upon what their members, or the public for public courses, are willing to pay. For example, a premium tee-off time may be 9:00 a.m. Saturday morning. Bids may be accepted for the 9:00 a.m. tee-off time, the highest bidder receiving the 9:00 a.m. time, with other bidders bidding less than the highest bidder receiving tee-off times as close to the 9:00 a.m. time as possible for each bid.
> . . .
> The system checks for whether the golfer's desired position is met for the tee-off time priority on a particular course. For example, the system checks for whether the golfer's bid exceeds all other bids in the auction for determining priority for a preferred tee-time. Another example allows the bidder to choose a tee-time, such as 9:30 a.m. instead of the premium time of 9:00 a.m.

'151 Patent 6:6-14, 46-52; see also '151 Patent 8:3-16 (detailing a similar example for seat selection by frequent flyers). This example shows that the bidder must tell the system whether the bidder wants to bid for the premium tee-off time, or if the bidder wants to bid for another tee-time. This is part of the bid management data entered by the bidder. The court, therefore, finds that the claim language and specification establish that the bidder enters the bid management data, and chooses the desired bidding position.

The prosecution history further supports that the bidder is the one who enters the bid management data. The February 4, 2004 amendment shows that the applicant first amended the claims to state that "the received bid management information includ[ed] a selected position of priority." (Feb. 4, 2004 Amend. at 4). The Examiner rejected the claims, and in the July 21, 2004 application, the applicant amended it to clarify that the selected position of priority be one "that the bidder wishes to maintain." (July 21, 2004 Amend. at 4). Thus, the applicant amended

11

the claims to clarify that it is the bidder, and not the system, that chooses the position of priority.

The court finds, however, that limiting the bidder's choice of a bidding position as an "express," or specific, choice is not supported by the claim language and specification. As the defendants conceded at the <u>Markman</u> hearing, the claims and specification do not make reference to an "express choice" that the bidder must make. The court notes that the bidder's choice may be an "express" choice but imposing a limitation that it must be the bidder's express choice would impermissibly narrow the claim language. As the tee-time example above shows, the bidder chooses a bidding position, and that bidding position may be a specific position, such as 9:30 a.m. However, the court finds that there is nothing in the claim language or specification that indicates the bidder must choose a specific position. The specification and claim language discuss the "desired bidding position" or the "position the bidder wishes to maintain." Reading those terms to mean that the bidder must choose an "express" position would exclude the possibility that the bidder may also choose the highest bidding position possible, which is not a specific position. The court, therefore, rejects the defendants' limitation that the bidder's choice must be an express choice.

The court, therefore, finds that the proper construction of the phrase should be **"information entered by the bidder that indicates the bidder's choice of one of the two or more positions of priority in the auction."**

    C.    <u>"selected position of priority"</u>

This phrase appears in both claim 1 and claim 11, as well as dependent claims 23 and 24, and refers back to the claim phrase the court construed above in section IV.B. Bid for Position provides three possible constructions for this phrase: (1) no construction of the phrase is

12

necessary; (2) the phrase should be construed to mean "the position of priority selected from the bid management data received from the first bidder;" or (3) the term "selected" should be construed to mean "chosen based on fitness or preference," and that no construction is necessary for "position of priority." The defendants argue this phrase should be construed to mean "the specific position expressly chosen by the bidder."

Both parties agree that the phrase "selected position of priority" refers back to the claim language: "received bid management data including information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction." There is also no dispute that the "selected position of priority" is a specific position of priority. The parties' main dispute over this phrase turns on whether the only way there can be a "selected position of priority" is if it is "expressly chosen by the bidder."

In the previous claim term construction, the court determined that the bidder chooses his bidding position. The court examined the claim language, the specification, and the prosecution history to find that the bidder must inform the system as to the desired bidding position, the bid, and if there is a maximum and/or minimum bid. This information is the bid management data. The court determined that the bidder provides the bid management data that includes the bidder's selection as to "one of the two or more positions of priority that the bidder wishes to maintain in the auction," and the system then manages the bidding with those parameters in mind. The court, however, refused to impose the limitation that the bidding position chosen by the bidder is his express choice. For similar reasons, the court declines to construe this claim term to mean that the bidding position must be "expressly" chosen by the bidder. As previously noted above, and as conceded by the defendants at the <u>Markman</u> hearing, there is nothing in the claim language or

specification to indicate that the position of priority must be "expressly" chosen by the bidder. In actuality, the claim language and specification simply indicate that the bidder chooses the position of priority. The court finds that proper construction of this term excludes the word "expressly." Therefore, the court will construe the phrase "selected position of priority" to mean **"the specific position chosen by the bidder."**

> D.   "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder"

Bid for Position provides two possible constructions for this phrase: (1) "checking" should be construed to mean "verifying, comparing, inspecting, or ascertaining," and the rest of the phrase does not need to be construed; or (2) "checking" is defined as above, "exceeds is construed to mean "greater than," and the rest of the phrase does not need to be construed. The defendants assert that this phrase should be construed to mean "determining whether the bid entered by the first bidder is larger than the bid entered by the second bidder." At the hearing, the parties agreed that "checking" means "comparing and ascertaining." There are two issues remaining to be resolved in construing this phrase: (1) whether "from the first bidder" is the same as "entered, or offered, by the first bidder;" and (2) what "exceeds" means.

The claim language in both claims 1 and 11 state that the bid management data is received from the first bidder, and the specification explicitly states that the bidder "may enter a bid into the online management system." '151 Patent 3:22-26; see also '151 Patent 5:39-43. 7:33-38, 9:36-41, 12:25-41. Bid for Position argues that construing "from the first bidder" to mean "entered by the first bidder" would be inappropriate because the system "enters" the bid into the auction when the bid management system repeats the steps of checking and incrementing. The court, however, finds that this argument mischaracterizes the process. No

14

where in the patent does it describe the bid management system as entering the bids; rather, the bidder enters the bid, possibly a maximum and/or minimum bid, and the desired bidding position into the system. See, e.g., '151 Patent 3:22-24, 36-37, 40-44. The system then manages the bid by checking to see whether the desired bidding position has been reached. See, e.g., '151 Patent 3:49-52, 4:48-5:18. If that position has been reached then the system will lower the bid to the minimum necessary to maintain that position. See, e.g., '151 Patent 4:54-60. If that position has not been reached, then the system will increase the bid, without exceeding the maximum bid, to attempt to achieve that position. See, e.g., '151 Patent 4:60-62. If the desired bidding position cannot be achieved, then the system can notify the bidder. See, e.g., '151 Patent 4:63-5:2. The system will then loop back through and continue to check and increment the bids as necessary. See '151 Patent, 5:3-5:18. At no point, however, does the specification or claims discuss the system "entering" a bid. The court, therefore, finds that "from the first bidder" means "entered by the first bidder" because the patent establishes that the bid management system receives the information from the bidder when the bidder enters the information into the system through the bidder terminal. In addition, the court finds that construing "from the bidder" to mean "entered by the bidder" provides continuity with other claim terms under construction, specifically the claim phrase construed in section IV.B of this order, "information for selecting one of the two or more positions of priority that the first bidder wishes to maintain in the auction."

The parties also dispute the meaning of the term "exceeds" in this phrase. Bid for Position argues that "exceeds" should be construed to mean "greater than," and the defendants argue that "exceeds" should be construed to mean "larger than." "Exceeds," as seen below, is a broad term that can be applied in a number of different contexts:

15

(1) to extend outside of or enlarge beyond; (2)(a) to be greater than or superior to, (b) to be too much for, be beyond the comprehension of; (3) to go beyond a limit set by, do more than justified or allowable under.  Webster's Third New International Dictionary 791 (3d International ed. 2002)

(1) to extend beyond or outside of; (2) to be greater than; (3) to go beyond the limits of.  The American Heritage Dictionary of the English Language 619 (4th ed. 2000).

"Exceeds," as used in the claim phrase, relates to the bids, or offers of price, and the claim language establishes that it is the values of the bids that are being compared to see if the first bid exceeds the second bid.  The court finds that, of all the possible definitions provided above, "exceeds," as it is used in the claim language, means "to be greater than," because this definition does not refer to the physical size of physical boundaries of an object.  The court finds that "larger than" is not an appropriate construction for "exceeds" because "larger than" describes the physical size of objects, and the physical size of the bid, or offer of the price, is not what is being compared.  See The American Heritage Dictionary of the English Language 987 (4th ed. 2004) (defining "larger" as "of greater than average size, extent, quantity, or amount; big").  The other definition, "to go beyond the limits of," would also not be appropriate because the patent does not deal with boundaries or limits.  Therefore, the court construes the claim term "exceeds" to mean "greater than," because that definition properly explains the meaning of the word as it is used in the claim.

In conclusion, the court will construe the claim phrase, "checking for whether a first bid from the first bidder exceeds a second bid from the second bidder," to mean **"comparing and ascertaining whether a bid entered by the first bidder is greater than the bid entered by the second bidder."**

E.     "the auction for determining continuing priority for providing an ongoing service"

Bid for Position provides two possible constructions for this phrase: (1) no construction of the phrase is necessary; (2) "continuing priority" should be construed to mean "ongoing priority," and "ongoing service" should be construed to mean "a service that is ongoing, continuing, or in progress." The defendants assert that this phrase should be construed to mean "the auction that determines priority for each instance that a service is provided during a continuing period." The heart of the parties' dispute is over what "continuing priority" means, and whether it includes a temporal aspect.

In examining the claim language and the patent, the inclusion of "continuing" to describe priority explains that the priority the bidder receives is priority for a period of time, while the system manages the bids. The main purpose of the patent is managing the bidder's bids by incrementing or decreasing the bid amount in an effort to maintain the bidder's desired position of priority without exceeding the maximum bid amount entered by the bidder. '151 Patent 1:33-1:54. Therefore, the bidder must have priority for a period of time so that the system can manage its bidding. The temporal quality of the bidder's priority is further emphasized by the fact that the bid management system, "may pause for a fixed period of time between each series of steps of checking and incrementing," and therefore, the bidder must hold its position of priority during these periods of time. '151 Patent 1:52-54. Additionally, to further emphasize that the bidder's priority continues for a period of time, the patent establishes that the bidder's position of priority is maintained until it is no longer possible to maintain that position without increasing the bid to an amount greater than the maximum bid amount. '151 Patent 4:48-5:2. The period of time that the bidder may hold that position of priority is not a fixed period of time, but the bidder will

17

continue to maintain until it is no longer possible without increasing the bid beyond the maximum bid amount. Finally, the '151 patent's reference to the prior art of the Goto.com patent as an explanation of continuing priority further supports the construction that the priority continues for a period of time. See '151 Patent 1:10-1:30. In the prior art Goto.com patent, each of the "winners" in the Goto.com auction would receive lasting rankings of first, second, third, etc., for all related web searches until another advertiser enters a new bid for the same keyword, and the auction would run again. See U.S. Patent 6,269,361, 5:59-6:8. Thus, the Goto.com patent would provide bidders with priority to each search engine placement for a continuing period of time. Id. The court, therefore, finds that the phrase continuing priority includes a temporal aspect and means that priority that continues for a period of time.

The court, however, does not finds that the defendants' construction of continuing priority as "priority for each instance" to be an accurate construction of the claim phrase. Instance refers to a single occurrence. See The American Heritage Dictionary of the English Language 907 (4th ed. 2000) (defining "instance" to mean "a case or occurrence"); Random House Webster's Dictionary 376 (4th ed. 2001) (defining "instance" to mean "a case or occurrence of something."). "For each instance" may imply that there are multiple, different instances or occurrences, which does not necessarily mean that they are continuing for a period of time. The court finds that construing continuing priority to mean priority for a period of time most accurately reflects the intention of the patent without rewriting the claim terms.

Finally, with respect to the phrase "ongoing service," the court finds that this phrase should be construed with its ordinary and custom meaning, which would be a service that is in progress, going on, or continuing without interruption. See The American Heritage Dictionary of

the English Language 1230 (4th ed. 2000) (defining "ongoing" to mean "in progress"); Webster's Dictionary 1576 (3d International ed. 2002) (defining "ongoing" to mean "the action that is going on"); Random House Webster's Dictionary 503 (4th ed. 2001) (defining "ongoing" to mean "continuing without interruption"). There is also nothing in the claim language or the specification to indicate that the word "ongoing" has any other meaning than its dictionary definition. In addition, the court notes that in construing this term, both parties use "continuing" to define ongoing, which is the dictionary definition of the word. As noted above, the court explained that continuing includes a temporal quality that indicates the action or event happens for a period of time. Because "ongoing" means "continuing," it would also include the same temporal aspect of occurring over time. The court, therefore, finds that the word "ongoing" shall be construed to mean "continuing."

The court, therefore, construes the following disputed portions of the claim phrase "an auction for determining continuing priority for providing an ongoing service" to mean **"an auction that determines priority for a period of time for providing a continuing service."**

> F.     "wherein the relative position of priority for providing the service for the first bidder is dependent upon whether the value of the first bid exceeds the value of the second bid" (and the analogous phrase in which "first" and "second" are interchanged)

Bid for Position provides two possible constructions for these phrases: (1) no construction of the phrase is necessary except to the extent that the terms contained in this phrase are separately construed elsewhere; or (2) the term "value" should be construed to mean "relative worth, utility, or importance." The defendants contend that these phrases should be construed to mean "where the bidder that bids the highest amount always gets priority over the bidder that bids the lower amount." The central dispute over the construction of this phrase turns on the

meaning of the word "value." The court has already determined that the term "exceeds" means "greater than," and the parties agree that a "bid" is an "offer of a price."

Reading the term "value" in the context of the surrounding claim language, the term "value" refers to the bid, or the offer of a price, and whether the value of one offer of a price is greater than the value of another offer of a price. The term "value" also appears in several other portions of the claims, and always refers to the bid:

- "A method of automatically managing an auction for determining relative priority for a service in a system where in priority is based upon the relative <u>value</u> of related bids. '151 Patent 14:2-5.

- "according to bid management data received from the first bidder, automatically incrementing the first bid to a <u>value</u> exceeding the second bid if the first bid does not exceed the second bid, thereby maintaining the selected position of priority for providing the service for the first bidder." '151 Patent 14:26-31.

- "and for automatically incrementing the first bid according to the bid management data received from the first bidder to a <u>value</u> exceeding the second bid if the first bidder does not exceed the second bid." '151 Patent 15:18-32.

- "further comprising executing a plurality of times the step of automatically reducing the first bid to a minimum which allows the bidder to keep the selected position of priority if the first bid exceeds a <u>value</u> needed to maintain the selected position of priority." '151 Patent 16:37-41.

- "wherein the processor is for further for automatically reducing the first bid a plurality of times to a minimum which allows the bidder to keep the selected position of priority if the first bid exceeds a <u>value</u> needed to maintain the selected position of priority." '151 Patent 16:42-46.

In addition, when the term "value" appears in the rest of the specification, it is also referencing a bid or bids:

- "whether the <u>value</u> of the first bid exceeds the value of the second bid." '151 Patent Abstract; '151 Patent 1:42-43.

- "incrementing the first bid to a <u>value</u> exceeding the second bid." '151 Patent, Abstract; '151 Patent 1:46-47

20

- "whether the <u>value</u> of the first bid is lower than the value of the second bid." '151 Patent 2:22-23

- "decrementing the first bid to a <u>value</u> lower the second bid if the first bid is not lower than the second bid." '151 Patent 2:28-29.

- "The relative priorities for providing the service for bidders for their bids received from bidder terminals are dependent on whether their bids exceed the <u>value</u> of other bids." '151 Patent 3:29-32, 5:46-49; 7:41-44.

- "The online bid management system will increment the lower bids until they reach desired bidding positions entered by the bidders as long as the bids do not exceed maximum <u>values</u> entered by the bidder." '151 Patent 3:40-44; 5:58-61; 7:53-57.

Therefore, in construing the proper meaning of "value," it is important to remember that the claim term is describing the bid.

> "Value" is a word that can have multiple dictionary definitions, including:

> (1) the amount of a commodity, service, or medium of exchange that is the equivalent of something else; (2) the monetary worth of something; (3) relative worth, utility, or importance, degree of excellence, status in a scale of preferences. <u>Webster's Third New International Dictionary</u> 2530 (3d International ed. 2002).

> (1) an amount, as of goods, services, or money, considered to be a fair and suitable equivalent for something else; (2) monetary or material worth; (3) worth in usefulness or importance to the possessor, utility or merit. <u>The American Heritage Dictionary of the English Language</u> 1900 (4th ed. 2000).

In examining the word "value" in the context of describing the bid, the court finds that Bid for Position's suggested definition of "relative worth, utility, or importance," is not the most accurate definition. The parties agree that "bid" is to be construed to mean an "offer of a price," and the inclusion of the word "price" is a reference to money or a money equivalent. If the bid was only an "offer," then it would be a broader term without any monetary limitation, and the value of the offer may then be described as its "relative worth, utility, or importance." However, because the "bid" is already construed to mean an "offer of price," the meaning of the term "value" is already

limited because it refers to the monetary amount of the offer of a price. The court finds that construing "value" to mean "amount" clearly explains how the term "value" is used in the patent. Therefore, "value" will be construed to mean "amount."

Additionally, the court is not persuaded that interpreting "value" to mean the "amount" of a bid would lead to absurd results such as five pesos having a greater "value" than four dollars. First, for such a result to happen, one would have to presume that all monetary units are equal and that one peso is equal to one dollar. Additionally, one would have to completely ignore the monetary unit component, "price," in the agreed construction of the claim term "bid," and focus solely on the numerical quantity attributed to that bid. Interpreting the term "value" to mean "amount" does not remotely suggest such results when read in the context of the other claim language and the rest of the patent.

Bid for Position also disputes the inclusion of the phrase "always gets priority" in the defendants' proposed construction as a replacement for "dependent upon," because it adds a modifier that is not present in the claim language. The defendants argue that this construction is appropriate because the claims and the specification establish that if the first bidder's bid is greater than the second bidder's bid, then the first bidder will always get priority. Notably, however, Bid for Position does not argue in their brief, or at oral argument, that this statement is incorrect, and that under the patent, it would be possible that a first bidder, whose bid is greater than the second bidder's bid, to not get priority. While the word "always" may not appear in the claim language, in reading the patent, it is clear that the first bidder, whose first bid amount is greater than the second bidder's bid amount, will always get priority over that bidder:

- A method and system for automatically managing an auction for determining relative priority for a service in a system wherein priority is based on the relative

22

value of related bids is disclosed. '151 Patent, Abstract; '151 Patent 1:33-37.

- The service provided to the bidders may comprise providing ranking of hypertext links to web pages in search results in an on-line web page search engine, wherein ranking of a first hypertext link to a first web page for the first bidder is higher than the ranking of a second hypertext link to a second web page for the second bidder if the first bid is higher than the second bid. '151 Patent, 1:55-61.

- The method may comprise placing bids on a plurality of search terms which may be typed into the search engine by search engine users wherein different ranking is determined for each search term, wherein the ranking of the first hypertext link is higher than the second hypertext link if the first bid is higher than the second bid for each plurality of search terms. '151 Patent 1:62-2:1.

After examining the patent, the court finds that at no point in the patent is the possibility

mentioned that the bidder, whose first bid is greater than the second bidder's bid, would not get

priority. The inclusion of the modifier "always" in the claim construction is in line with the

patent's boundaries and explains that the priority of the bids is based upon their values, or

amounts, and that the higher bid will have a higher priority than the lower bid. See Pulse Tech.,

LLC v. TiVo, Inc., 419 F.3d 1326, 1333 (Fed. Cir. 2005) (noting that while courts may not

rewrite claim terms, "in clarifying the meaning of claim terms, courts are free to use words that

do not appear in the claim so long as the resulting claim interpretation accords with the words

chosen by the patentee to stake out the boundary of the claimed property.") (internal quotations

and citations omitted).

The court therefore interprets the claim phrases: "wherein the relative position of priority

for providing the service for the first bidder is dependent upon whether the value of the first bid

exceeds the value of the second bid" and "wherein the relative position of priority for providing

the service to the second bidder is dependent on whether the value of the second bid exceeds the

value of the first bid," to mean "**where the bidder that bids the greater amount always gets**

**priority over the bidder that bids the lower amount.**"

      G.    "input device"

Bid for Position asserts that "input device" should be construed to mean "a device for transferring data into a processor system." The defendants contend that "input device" should be construed to mean a "bidder terminal or other data entry device at the bidder's location." The parties dispute whether the input device is the device at the bidder's location that the bidder uses to enter the bid management data to the system.

This term only appears in claim 11 and does not appear anywhere else in the patent. Specifically, claim 11 states

> [a] system for automatically managing an auction for determining relative priority for a service in a system wherein priority is based upon the relative value of related bids, comprising: <u>an input device for receiving bid management data from a first bidder for managing bidding by the first bidder in the auction.</u>

'151 Patent 15:4-10. The court has already determined that the bid management data includes the bid, the maximum and/or minimum bid, and the desired bidding position. The court has also determined that it is the bidder who enters this information into the bid management system. As claim 11 states above, the input device is the part of the bid management system that receives the bid management data from the bidder. The specification discusses the process in greater detail:

-    Bids are made from bidder terminals or computers (called bidder terminals herein) which may comprise Internet terminals with keyboards as one skilled in the art would recognize. A User may enter a bid into the online bid management system through a bidder terminal, which transmits the bid to the bid management server. '151 Patent 3:19-24.

-    The server may further comprise a database comprising a relational database management system for storing bids and data relating to the service provided to the bidders. Bidders may further enter maximum and/or minimum bids into the bidder terminals. The online bid management system keeps track of the maximum and minimum bids for each user who enters bids into the bidder

terminals into RDBMS. '151 Patent 3:32-40.

According to the specification, the bidder terminal receives the bid management data from the bidder and transmits that information to the bid management server. Generally different terms in the patent are construed to have different meanings. See Innova/Pure Water, Inc., 381 F.3d at 1119-1120 (stating that "when an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms."). The court, however, notes that in the specification, the applicant repeatedly referred to the "bidder terminals" as the device that the bidder enters bids into and that transmits that information to the bid management system. The applicant used the term "input device" in claim 11 to describe the device that receives the bid management data from the bidder. The court finds that, after examining the use of both terms in the patent, they serve the same purpose in the patent; they are the device that the bidder enters the bid management data into. The court, therefore, concludes that they are the same thing, and that the input device is the bidder terminal, both of which mean data entry device.

The court, however, finds that construing the claim to mean the bidder terminal must be at the bidder's location would impose a limitation that is not supported by the claim language or specification. The patent does not specify where the bidder terminal or input device is located. While it is likely that the input device would be located with the bidder, the patent does not required that the input device must be located with the bidder. The court finds that a limitation on the location of the bidder terminal would impermissibly narrow the claim term. Therefore, the court construes the claim term "input device," to mean **"bidder terminal, which is a data entry device."**

25

## V. Conclusion

For the reasons set for above, the court issues this Order and Opinion as the construction of the claims in the '151 patent.

The Clerk is **REQUESTED** to send a copy of this Order and Opinion to counsel of record.

It is so **ORDERED**.

/s/

Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 11, 2008